Nikki **MISKOVICH** and Robert Zuehlke, Jr., Plaintiffs,

v.

**INDEPENDENT SCHOOL DISTRICT 318; Itasca County, Minnesota; St. Louis County, Minnesota; City of Grand Rapids, Minnesota; Myles Reif Performing Arts Center; David Marty; Ron Hohman; Jerry Cuffe; Jason Akerson; Tim Peterson; Joseph Zebro; Bernard Mettler; Michael Scott; and Randall Lehman, Defendants.**

**Ellen Schafroth; Beverly Wilson and David Wilson, Plaintiffs,**

v.

**City of Grand Rapids, Defendant,**

and

**St. Louis County, Minnesota; Ron Hohman; Jerry Cuffe; Jason Akerson; Tim Peterson; Joseph Zebro; Bernard Mettler; Michael Scott; and Randall Lehman, Defendants and Third–Party Plaintiffs,**

v.

**Myles Reif Performing Arts Center, and David Marty, Third–Party Defendants.**

**Civ. Nos. 00–1944 (RLE), 01–824(RLE).**

United States District Court, D. Minnesota.

July 29, 2002.

John Drake Undem, Saturi & Undem, Grand Rapids, MN, for Plaintiffs.

Michael Thomas Feichtinger, Quinlivan & Hughes, St. Cloud, MN, Scott Thomas Anderson, Ratwik, Roszak & Maloney, Minneapolis, MN, Shaun Robert Floerke, St. Louis County Attorney, Duluth, MN, Jon K. Iverson, Jason J. Kuboushek, Iverson Reuvers, Bloomington, MN, for Defendants.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

These matters came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, in accordance with the provisions of Title 28 U.S.C. § 636(c), upon the Motions of the Defendants', and of the Third–Party Defendants', for Summary Judgment, as well as upon the Plaintiffs' Motion to Amend their Complaints. A Hearing on the Motions was conducted on January 17, 2002, at which time, the Plaintiffs appeared by

John D. Undem, Esq.; the Defendants, and Third–Party Defendants, Myles Reif Performing Arts. Center ("Reif Center"), and David Marty ("Marty"), appeared by Michael T. Feichtinger, Esq.; the Defendant City of Grand Rapids ("Grand Rapids") appeared by Jon K. Iverson, Esq.; and the Defendants, and Third Party Plaintiffs, St. Louis County, Jason Akerson ("Akerson"), Jerry Cuffe ("Cuffe"), Ron Hohman ᐧ ("Hohman"), Randall Lehman ("Lehman"), Bernard Mettler ("Mettler"), Tim Peterson ("Peterson"), Michael Scott ("Scott"), and Joseph Zebro ("Zebro"), appeared by Shaun R. Floerke, Esq.

For reasons which follow, we grant the Motions for Summary Judgment of Akerson, Lehman, the Reif Center, and Marty; we grant, in part, the Motions for Summary Judgment of Grand Rapids, St. Louis County, Peterson, and Scott; and we deny the Motions for Summary Judgment of Cuffe, Hohman, Mettler and Zebro. In addition, we grant the Plaintiffs' Motion to Amend their Complaints.

### II. *Factual and Procedural History*

These cases arise from injuries, which were allegedly inflicted upon the Plaintiffs, during the conduct of a training exercise at the Grand Rapids High School, on July 14, 1999. The Plaintiffs are Nikki Miskovich ("Miskovich"), her husband Robert Zuehlke, Jr., Ellen Schafroth ("Schafroth"), Beverly Wilson ("Wilson"), and her husband David Wilson.[1] The Plaintiffs, in both cases, have sued Grand Rapids, St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, while Miskovich, and her husband,

---

**1.** The husbands of both Miskovich, and Wilson, have pled claims for a loss of consortium, and companionship. These claims are solely derivative of the actions commenced by their respective wives and, therefore, they rise or fall on the success, or failure, of the wives' claims. See, *Alholm v. O'Bryan Law Center,* 2000 WL 1196202 at \*7 (D.Minn. March 27, 2000)("In Minnesota, a claim for loss of consortium is a derivative action and, therefore, does not exist independent of the injured spouse's right to maintain an action for the injuries sustained."), citing *Thill v. Modern Erecting Co.,* 284 Minn. 508, 513, 170 N.W.2d 865, 869 (Minn.1969). Accordingly, we do not separately address these derivative claims.

have also sued the Reif Center and Marty.[2] In addition, the Reif Center, and Marty, have been joined, as Third–Party Defendants, by St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, in the action brought by Schafroth, Wilson, and Wilson's husband. All of the Defendants, and the Third–Party Defendants, seek Summary Judgment, on the bases of a variety of defenses. In addition, each of the Plaintiffs seek leave to amend their respective Complaints, in order to clarify that they are suing the Defendants, in both their official and individual capacities.

While the Defendants played somewhat different roles in the events, which generated these actions, we will outline the undisputed facts, highlight any factual disputes, and then address the claims against each of the Defendants separately, insofar as they are distinct. Much of what we recite gives proof to the adage that, "[i]n any great organization it is far, far safer to be wrong with the majority than to be right alone."[3]

On July 14, 1999, Schafroth, and Wilson, were employees of the Reif Center, while Miskovich was a newly hired independent contractor, who had begun teaching a Summer class, at the Reif Center, approximately one week before the incident giving rise to these actions, although the first class, for which Miskovich was paid, was in September of 1999. See, *Deposition of Nikki Miskovich*, at 62, 80–85, *Ex. B to Aff. of John D. Undem* ("Miskovich Deposition"); *Deposition of Ellen Schafroth*, at 5–6, *Ex. C to Aff. of John D. Undem*

("Schafroth Deposition"); *Deposition of Beverly Wilson*, at 6, *Ex. D to Aff. of John D. Undem* ("Wilson Deposition"). Miskovich visited the Reif Center, on July 14, 1999, in order to meet with Wilson, who was the dance director at the Reif Center, and to begin preparing for her dance classes. See, *Miskovich Deposition*, at 60. In addition to Miskovich and Wilson, four other employees were in the Reif Center on July 14, 1999, including Schafroth, Jennifer Lien ("Lien"), Robert Cline ("Cline"), and Marty. The Reif Center, and the Grand Rapids High School, are physically attached, and there are only two entrances, by road, to the campus. See, *Ex. A to Aff. of John D. Undem.*

In the wake of the events, in April of 1999, at Columbine High School, in Littleton, Colorado, Stephan Valley ("Valley"), who was a Grand Rapids Police Officer, and the training coordinator for the Grand Rapids Emergency Response Team ("Grand Rapids ERT"),[4] began to plan a training exercise involving the Grand Rapids Senior High School. See, *Deposition of Stephen Valley*, at 5–8, *Ex. I to Aff. of John D. Undem* ("Valley Deposition"). Valley wanted to set up a scenario, which would involve a hostage-rescue type situation, and which would employ the Grand Rapids High School facility, as well as its students. See, *Deposition of Randall Lehman*, at 8, *Ex. O to Aff. of John D. Undem* ("Lehman Deposition"). Initially, Valley contacted Joe Silko ("Silko"), who was the Principal of the High School, and Mark Adams ("Adams"), the Assistant Principal, about coordinating the training exercise at

---

2. Although Miskovich, and her husband, had also sued Independent School District # 318, and Itasca County, both Defendants were subsequently dismissed, voluntarily, on April 17, 2001. See, *Stipulation of Dismissal and Judgment*, Civ. No.1944 [Docket Nos. 32 and 33].

3. Galbraith, John Kenneth, *Guardian* (London, July 28, 1989).

4. The Grand Rapids ERT is composed of approximately twenty-five members. See, *Deposition of Stephen Valley*, at 6–7, *Ex. I to Aff. of John D. Undem* ("Valley Deposition"). Half of the members are Grand Rapid's Police Officers, while the other half are Itasca County Sheriff's Deputies. *Id.*

the school. See, *Valley Deposition*, at 8–9. Silko and Adams were interested in the training exercise. *Id.*

In May of 1999, Valley contacted Lehman, who was the Commander and Coordinator of the St. Louis County Emergency Response Team ("St. Louis County ERT"), about participating in the training exercise. See, *Lehman Deposition*, at 8. Lehman thought it would be a good idea, and an excellent opportunity in light of the recent Columbine shootings. *Id.* St. Louis County was not involved in planning the exercise, but was only asked to participate. *Id.* at 14–15.

Next, Valley held several meetings with school officials concerning the planning of the training exercise. See, *Valley Deposition*, at 9. As already noted, during the first meeting, which occurred about a month or two prior to the training, see, *id.* at 9; *Deposition of Mark Adams*, at 6, *Ex. H to Aff. of John Undem* ("Adams Deposition"), Valley, Silko, and Adams, agreed to have the training exercise during the Summer, because then there would be the least number of people at the school. See, *Valley Deposition*, at 10. They also talked about the crisis training exercise in general terms. See, *Adams Deposition*, at 7. The training details were left to the law enforcement officials, however. *Id.*

Approximately one week later, Valley and Adams met again. *Id.* During the meeting, they roughed out the parameters of the area to be used in the training exercise. *Id.* at 7–8; see also, *Valley Deposition*, at 10. The exercise was to include three to five classrooms around the high school office, the high school office, and a chemistry, or physics laboratory, on the third floor. See, *Adams Deposition*, at 8.

Valley and Adams met a third time and, along with another officer who, Adams believed, worked with the Grand Rapids Police Department, walked through the rooms to be used in the training exercise. *Id.* at 9–10. Apparently, at that time, there was some discussion about the Reif Center not being a part of the training exercise. *Id.* at 10–12; see also, *Valley Deposition*, at 10–12 (remembering a discussion regarding the fact that the Reif Center was off limits, but not when the discussion occurred). There is a disagreement, between Valley and Adams, though, as to whether there was a particular discussion regarding who would notify people about the training, with Valley recalling a specific discussion, in which it was agreed that Adams had the responsibility of notifying those individuals, who would be in the school during the training exercise, such as teachers and students. *Valley Deposition*, at 25–26. Adams denies such a discussion, however. *Adams Deposition*, at 12–13. Nevertheless, Adams took it as his responsibility to notify the students, the parents, and the Summer school and teaching staffs, see, *id.* at 12–13, and Valley believed that the school would be notifying the Reif Center staff, see, *Valley Deposition*, at 53. Valley never had any communication with the Reif Center about the training exercise. *Id.* at 95.

In addition to the notifications provided by Adams, Valley also contacted the newspaper, prior to July 14, 1999, and told them that a training exercise was to take place. *Id.* at 21. He further notified the public television, and the local radio stations, about the training exercise. *Id.* at 22–23. Valley did not follow-up, however, to verify whether anything had been placed in the newspaper, or had been broadcast on the radio or television stations. *Id.* at 21–22. Moreover, there is no evidence, that we have uncovered, or that has been flagged by the parties, about anyone having seen any such notifications, and only one individual recalls hearing about the training, at some point, during the morning of July 14, 1999. See, *Depo-*

*sition of Ann Helmer,* at 51–52, *Ex. K to Aff. of John Undem* ("Helmer Deposition").

On June 15, 1999, Valley, Lehman, Adams, and five to seven other individuals, conducted a walk-through of the Grand Rapids High School. See, *Adams Deposition,* at 27; *Valley Deposition,* at 15–17; *Lehman Deposition,* at 9–10. According to Lehman, the individuals, who represented the St. Louis County ERT, were Bill Hanegmon and himself. *Lehman Deposition,* at 9. The purpose of the walk-through was to show everyone the facility, as some of them had never been there before. See, *Valley Deposition,* at 16. The group toured the majority of the facility, including the boiler room, gym, locker rooms, office lobby area, and several surrounding classrooms. See, *Adams Deposition,* at 27–28. During the tour, the law enforcement personnel were told that the Reif Center, and several other portions of the building, would not be involved in the training exercise. See, *Valley Deposition,* at 17; *Lehman Deposition,* at 11. According to Lehman, though, by the end of the exercise, even though he knew the Reif Center would not be involved, he did not know the precise dimensions of the Reif Center, and he recalled that Valley, or Adams, had stated that the officers were only to enter through open doorways, and that any locked doorway would be off limits. *Lehman Deposition,* at 11–13. Lehman did not understand that the Reif Center had its own entrance, or offices. *Id.* at 12. The tour group did, however, view parts of the Reif Center, including the performing arts stage, which was reached through an internal entrance. *Id.* at 11–12.

As the walk-though was concluding, Marty, who was the director of the Reif Center, purportedly came up to Adams, and asked what was occurring. See, *Adams Deposition,* at 43–45. Marty is alleged to have made some "offhand remark about there being a lot of people in uniforms; it looked like some kind of invasion." *Deposition of David Marty,* at 34, *Ex. G to Aff. of John D. Undem* ("Marty Deposition"). Adams assertedly told Marty about the training exercise, and the date on which it was to take place. See, *Adams Deposition,* at 43–45. Marty claims, however, that he was confused as to the particular day on which the training exercise was to occur, and he contends that he believed that, when he spoke to Adams, the training had already concluded. *Marty Deposition,* at 34.

Later that week, Adams called the Reif Center, and spoke with Lien, who was Marty's assistant. See, *Adams Deposition,* at 46–47; *Deposition of Jennifer Lien,* at 31, *Ex. E to Aff. of John D. Undem* ("Lien Deposition"). Adams wanted to ensure that there would be no students, or activities, scheduled at the Reif Center, which would warrant further notices to those groups. See, *Adams Deposition,* at 46. During the course of that conversation, he also briefly mentioned the training exercise, or drill. *Id.; Lien Deposition,* at 31. Lien informed Adams that no students were scheduled to be at the Reif Center, on the day of the exercise. See, *Adams Deposition,* at 47; *Lien Deposition,* at 31. She also told Marty that Adams "had called to ask if we had dance lessons on" July 14, "because they were going to be doing a drill." *Lien Deposition,* at 32. Lien believed that Marty had made a mental note of the phone call. *Id.*

Prior to the actual training exercise, Valley formulated several different training scenarios. See, *Valley Deposition,* at 27–29. All of the scenarios assumed a disturbance at the high school.

The first scenario involved an officer, who was downed in the parking lot of the school, while the second involved a class-

room hostage situation. *Id.* The response teams had to determine how to deal with the hostage takers, the student hostages, and any wounded hostages. *Id.* The third scenario assumed a hostage/hazardous material situation, arising in a third floor chemistry laboratory. *Id.* In order to make the scenarios as realistic as possible, the situations needed to be fluid, or constantly changing. *Id.;* see also, *Deposition of Patrick Medure,* at 48, *Ex. X to Aff. of John D. Undem* ("Medure Deposition"). As a consequence, the participating teams would be told only basic information, and they would not be made aware of the changes that would confront them, in order to make the exercise realistic. See, *Valley Deposition,* at 29; *Medure Deposition,* at 48.

On the day of the training exercise, July 14, 1999, between 7:00 o'clock and 8:00 o'clock a.m., the Grand Rapids Police Department Reserves met for the training drill. See, *Deposition of Jackie Heinrich,* at 9, *Ex. J to Aff. of John D. Undem* ("Heinrich Deposition"); *Helmer Deposition,* at 7; *Deposition of Anne Bylkas,* at 7–8, *Ex. L to Aff. of John D. Undem* ("Bylkas Deposition"); *Deposition of Lisa Kotula,* at 8, *Ex. N to Aff. of John D. Undem* ("Kotula Deposition"). The Reserve Officers were to serve as the outer perimeter security force. See, *Lehman Deposition,* at 25; *Helmer Deposition,* at 8–9; *Bylkas Deposition,* at 8. Perimeter security involved the barricading of the entrance to the campus with their bodies, and the stopping of vehicles to inform the occupants about the training drill. See, *Helmer Deposition,* at 8, 11, 13; *Bylkas Deposition,* at 8–9; *Deposition of Nancy Sura,* at 8, *Ex. M to Aff. of John D. Undem* ("Sura Deposition"); *Kotula Deposition,* at 11, 14. Valley understood that the Reserves would man their positions at 6:45 o'clock a.m. See, *Valley Deposition,* at 31. However, after being briefed on the exercise, most of the Reserve Officers did not man their positions until between 8:00 and 9:00 o'clock a.m. See, *Helmer Deposition,* at 10 (in position by probably 8:15 o'clock a.m.); *Bylkas Deposition,* at 8–12 (in position between 8:45 and 9:00 o'clock a.m.); *Kotula Deposition,* at 13 (in position by about 8:45 o'clock a.m.). No signs were placed near the entrances to advise of the training scenario. See, *Valley Deposition,* at 64.

When Wilson arrived for work on July 14, 1999, at 7:00 o'clock a.m., she claims that there were no barricades, or anything else, which would indicate that a tactical scenario would be occurring. See, *Wilson Deposition,* at 18, 24. The same was true for Marty, who arrived at 7:00 o'clock a.m., see, *Marty Deposition,* at 9–10; for Cline, who arrived at about 7:50 o'clock a.m., see, *Deposition of Robert Cline,* at 6–7, *Ex. F to Aff. of John D. Undem* ("Cline Deposition"); for Lien, who arrived somewhere around 8:00 o'clock a.m., see, *Lien Deposition,* at 6–7; for Schafroth, who arrived between 8:30 and 9:00 o'clock a.m., see, *Schafroth Deposition,* at 19–22; and for Miskovich, who arrived between at 9:30 and 10:00 o'clock a.m., see, *Miskovich Deposition,* at 7–8. However, Adams, who apparently arrived at approximately 7:15 or 7:30 o'clock a.m., through a second entrance which was the furthest away from the Reif Center, and which was not, by all appearances, used by the Reif Center employees on that day, claims that barricades were being set up when he arrived, and that he was stopped by a female officer. *Adams Deposition,* at 19.

At approximately 8:00 o'clock a.m., the St. Louis County ERT, along with the Grand Rapids ERT, and other emergency management service members, arrived at either the Grand Rapids Fire Hall, or an arena, for briefing. See, *Lehman Deposition,* at 13; *Deposition of Bernard Mettler,* at 8–9, *Ex. P to Aff. of John D. Undem*

("Mettler Deposition"); *Deposition of Joseph Zebro*, at 8, *Ex. Q to Aff. of John D. Undem* ("Zebro Deposition"). Lehman maintains that he was informed by Valley, at some time prior to the training exercise, that the high school would be secured prior to the training, and that there would be signs, and barricades, which would alert people of the training program. *Lehman Deposition*, at 14. Prior to arriving at the fire hall on the day of the training, the St. Louis County ERT members—which included Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott and Zebro—understood that the training exercise would involve circumstances similar to the shootings at Columbine High School, including multiple suspects, multiple victims, and multiple role players, in a school setting. See, *Mettler Deposition*, at 9; *Zebro Deposition*, at 9; *Deposition of Ronald Hohman*, at 7–8, *Ex. S to Aff. of John D. Undem* ("Hohman Deposition"); *Deposition of Michael Scott*, at 7, *Ex. T to Aff. of John D. Undem* ("Scott Deposition").

Valley began the morning briefing by giving the team leaders, and Lehman, a quick overview of the possible scenarios. See, *Valley Deposition*, at 35; *Lehman Deposition*, at 53. Information was limited in order to make the situation as realistic as possible. Valley appears to have informed the group that: 1) some upset students entered the Grand Rapids High School; 2) school officials called law enforcement; 3) a marked patrol car responded to the call; 4) upon arriving at the school, the officers encountered gunfire; 5) one of the officers was hit and pinned down by gunfire; and 6) it was believed that the suspects were still in the school. See, *Lehman Deposition*, at 53; see also, *Scott Deposition*, at 10. Apparently, the teams were warned that the suspects could be deceptive, and could try to disguise themselves and escape, so the team members would have to be very careful in identifying the suspects. See, *Lehman*

*Deposition*, at 54–55; *Hohman Deposition*, at 28.

Team members were also advised that exercise observers would be wearing orange vests. See, *Lehman Deposition*, at 114–15; *Mettler Deposition*, at 58–59; *Zebro Deposition*, at 10–11, 43; *Hohman Deposition*, at 11–12; *Scott Deposition*, 10–11, 54; *Deposition of Jason Akerson*, at 7, *Ex. U to Aff. of John D. Undem* ("Akerson Deposition"). Non-participants would not be wearing orange vests, and would tell the team members that they were not involved in the exercise, and should be left alone. See, *Lehman Deposition*, at 114–15; *Mettler Deposition*, at 30–31; *Zebro Deposition*, at 10–11; *Hohman Deposition;* at 11–12; *Akerson Deposition*, at 7; *Deposition of Jerome Cuffe*, at 21–22, *Ex. v. to Aff. of John D. Undem* ("Cuffe Deposition"). Valley believed that everyone at the school facility knew about the training exercise, see, *Valley Deposition*, at 61, 90, and he so advised the officers at the briefing, *id.* at 61; *Lehman Deposition*, at 114–15; *Mettler Deposition*, at 30–31; *Zebro Deposition*, at 10–11; *Scott Deposition*, at 10–11, 54; *Cuffe Deposition*, at 21–22.

Valley instructed the group they were to enter the school facility only through unlocked doors. *Valley Deposition*, at 54–55; see also, *Lehman Deposition*, at 81; *Mettler Deposition*, at 10; *Zebro Deposition*, at 10; *Cuffe Deposition*, at 17. There were to be no forced entries into the school. See, *Zebro Deposition*, at 10. It was Valley's understanding that, prior to the exercise, school janitors would unlock certain entry doors, but he did not double check those doors. See, *Valley Deposition*, at 55. It appears that, at no point during the briefing, did Valley inform the teams that the Reif Center was off limits. See, *Mettler Deposition*, at 12; *Zebro Deposition*, at

14; *Scott Deposition,* at 41; *Akerson Deposition,* at 45; *Cuffe Deposition,* at 17.

Immediately after learning of the first scenario, the training exercise commenced. Akerson and Cuffe were sent, by the St. Louis County ERT, as scouts to view the Grand Rapids High School. See, *Mettler Deposition,* at 12–13; *Akerson Deposition,* at 8; *Cuffe Deposition,* at 17. At approximately 9:25 o'clock a.m., Akerson and Cuffe returned, and met with their team in order to discuss the layout of the school, and their entry plan. See, *Lehman Deposition,* at 7; *Mettler Deposition,* at 13; *Zebro Deposition,* at 15; *Akerson Deposition,* at 10, 31. Valley was not involved in forming the individual, tactical plans. See, *Valley Deposition,* at 69–72, 89. Valley did, however, provide a map of the first floor of the high school to the emergency response team leaders. See, *Valley Deposition,* at 40–41, 60; *Lehman Deposition,* at 27–28. The Reif Center was not included on that map. See, *Valley Deposition,* at 45; *Mettler Deposition,* at 14; *Cuffe Deposition,* at 28. Neither was the second or third floor of the building, however, which was where the chemistry laboratory was located, that would later become an issue in the scenario, arising from an assumed hazardous materials situation. See, *Valley Deposition,* at 41.

Cuffe, while scouting prior to the start of the training exercise, was concerned that there were construction people present, who might have been unaware of the training scenario, and he informed Lehman of that concern at the Command Center. See, *Cuffe Deposition,* at 20–21. Lehman assertedly replied that he would double check in order to assure that everyone was informed of the training exercise, and he then confirmed that all of the individuals knew of the training program. *Id.* at 21.

At approximately 9:45 o'clock a.m., the teams, and their commanders, left the fire hall and went to the arena by the high school. It was determined that a Command Center would be set up in that arena. See, *Valley Deposition,* at 30; *Lehman Deposition,* at 79–80. The purpose of the Command Center was to coordinate the movement of the response teams. The St. Louis County ERT, and the Grand Rapids ERT, used different radio channels, and consequently, their only communication was through the Command Center. See, *Valley Deposition,* at 44; *Lehman Deposition,* at 21–22. The commanders of both teams, including Lehman, stayed at the Command Center and did not proceed into the high school. See, *Valley Deposition,* at 36; *Lehman Deposition,* at 79–80.

The Grand Rapids ERT, and the St. Louis County ERT, approached the school from different positions. See, *Lehman Deposition,* at 66–67. The team leaders, which included Mettler and Zebro, determined that the Grand Rapids ERT, and the St. Louis County ERT, would enter the building from opposite ends, and would proceed toward the main lobby, clearing and securing areas as they progressed. See, *Mettler Deposition,* at 17. Once the teams met in the lobby area, they were then to proceed, together, toward the area in which they believed the hostages were being held. See, *Affidavit of Joseph Zebro,* at & 10 ("Zebro Aff."). The team leaders determined that the St. Louis County ERT would come in from the northwest portion of the building. See, *Mettler Deposition,* at 17. It appears that none of the St. Louis County ERT entry team members had been to the Reif Center before. See, *Mettler Deposition,* at 10–11; *Zebro Deposition,* at 14, 43–44; *Deposition of Timothy Peterson,* at 42, *Ex. R to Affidavit of John D. Undem* ("Peterson Deposition"); *Akerson Deposition,* at 9; *Cuffe Deposition,* at 55–56. Further, it appears that none of them were aware of

that the Reif Center existed, or that it was a part of the high school building. See, *Mettler Deposition*, at 12; *Zebro Deposition*, at 14, 43–44; *Peterson Deposition*, at 42; *Akerson Deposition*, at 20, 45; *Cuffe Deposition*, at 17–18, 55–56.

When the training scenario began, at approximately 10:00 o'clock a.m., the teams first tended to the downed officer, who was located in the parking lot outside the school. See, *Zebro Affidavit*, at & 12. At that time, hostage takers were already firing shots inside and outside of the school building. *Id.* Miskovich testified that she had heard gunfire in the Reif Center, at some point. *Miskovich Deposition*, at 25. Once the teams treated the downed officer, they proceeded to the next phase of the exercise, which was to enter the high school. The St. Louis County ERT entry team, which included Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, went around the back side of the high school, in order to gain entry to their portion of the building, which was supposed to be the portion directly adjacent to the the Reif Center. See, *Zebro Aff.*, at & 15.

Akerson was assigned to the inner perimeter, along with Heinrich, and they went to the outer edge of the high school, which appears to be one of the walls on the back side of the Reif Center. See, *Heinrich Deposition*, at 23–24; *Akerson Deposition*, at 16–20. The entry team came around the back side of the building, to where Akerson and Heinrich had set up their perimeter position. See, *Heinrich Deposition*, at 25; *Zebro Deposition*, at 20;

*Akerson Deposition*, at 17–18. The entry team, and Akerson, were all wearing their field uniforms, which were comprised of camouflage fatigues, with Sheriff's Department patches on the shoulders, and were carrying field equipment, including inoperable weapons.[5] See, *Ex. 1 to Zebro Aff.* At 10:21 o'clock a.m., the entry team was in position. See, *Handwritten Log of St. Louis County ERT Actions, Ex. CC to Affidavit of John D. Undem* ("St. Louis County ERT Log"); see also, *Lehman Deposition*, at 22–23. At 10:23 o'clock a.m., it appears that the Command Center radioed the entry team, and advised them that the Grand Rapids ERT was in position. See, *St. Louis County ERT Log.* At 10:25 o'clock a.m., both entry teams were advised to enter the building. *Id.*

Shortly after the training exercise began, Lehman became aware that law enforcement personnel were encountering individuals, on the campus, including students coming for activities and delivery persons, who were not involved in the scenario, and who were unaware of the exercise.[6] See, *Report Prepared by Randall Lehman, Ex. DD to Aff. of John D. Undem* ("Lehman Report"). In spite of this information, Lehman did not instruct his team to discontinue the training exercise, and he did not inform the entry team that there were people who were not aware of the training exercise. See, *Lehman Deposition*, at 20–21.

Initially, the entry team entered the school through a door which was later

---

**5.** Most of the individuals at the Reif Center, including Miskovich, Wilson, Schafroth, and Lien, claim that the St. Louis County ERT team was not identifiable, either by verbal warning, or visually, as police officials. See, *Miskovich Deposition*, 21; *Schafroth Deposition*, at 49; *Wilson Deposition*, at 33; *Lien Deposition*, at 16. Miskovich does, however, recall that one of the officers did say something to the effect of "oh, we're cops," but she

did not believe the officer because he had just previously been using profanity with the women. *Miskovich Deposition*, at 31.

**6.** In his deposition, Lehman testified that he was not certain whether the individuals were, or were not, aware that the exercise was occurring, or whether they just simply were not involved. See, *Lehman Deposition*, at 30–31.

identified as an entrance to the Reif Center. As the team made a partial initial entry, the team leaders determined that they may not have been in the right place, and Zebro radioed to the Command Center, at 10:27 o'clock a.m., that they may have entered the wrong door, and that they were readjusting. See, *St. Louis County ERT Log; Zebro Aff.* at & 15. Thereafter, Mettler and Zebro conversed about the appropriate entry, and tried some other doors, which were found to be locked.[7] See, *Mettler Deposition,* at 19, 21–23; *Lehman Report; Report Prepared by Joseph Zebro, Ex. FF to Aff. of John D. Undem* ("Zebro Report"); *Zebro Affidavit,* at & 16. Then, they determined that the initial door, that they had attempted to enter, must have been the correct one. See, *Mettler Deposition,* at 23; *Zebro Report; Zebro Affidavit,* at & 20. They entered the door, and the team split up, with Cuffe, Hohman, and Mettler, moving to secure the rooms that the Plaintiffs were occupying. See, *Mettler Deposition,* at 23–25; *Hohman Deposition,* at 18; *Cuffe Deposition,* at 39–40. Peterson, Scott, and Zebro, proceeded down the hallway. See, *Zebro Deposition,* at 28; *Peterson Deposition,* at 22; *Scott Deposition,* at 34.

At that time, the Plaintiffs were all working at the Reif Center, in the observation room, or in an adjoining office. See, *Wilson Deposition,* at 27. Schafroth testified that she saw a man, in camouflage, walk past the doorway towards the outside door, and that she thought he might be in the wrong place. *Schafroth Deposition,* at

31. Miskovich also noticed men in camouflage. *Miskovich Deposition,* at 17. Although she did not initially see the men, Wilson contends that she heard Schafroth state that there were "guys runnin' around out here with guns." *Wilson Deposition,* at 27.

Schafroth then went to look in the hallway, where she heard one of the men say to another man, "I think we're in the wrong place." *Schafroth Deposition,* at 33. Schafroth approached the men, and asked who they were and what they were doing. *Id.* at 35; *Miskovich Deposition,* at 18. One of the men in fatigues told her to "never you mind," while raising his hand, palm forward. *Schafroth Deposition,* at 35. Schafroth also testified that the man seemed confused, and she assumed that he was telling her to back off, while he got things figured out. *Id.*

Consequently, Schafroth returned to the observation room. *Id.* at 36. She picked up a telephone in order to call Marty in the Reif Center's main office. *Id.* at 39. She recalled that she was not scared at that point, and she told Marty that there were men in the hallway with guns. *Id.* at 42. She explained that someone then put a bunker shield, and a gun in her face, and shouted at her to put the phone down. *Id.* at 44. She exchanged words with the men—at least two men were reportedly in the observation room—at which time both she, and the men, were using profane language.[8] *Id.* at 46. When she would not put the telephone down, it was, allegedly,

---

7. It appears that one of the doors, which was locked, was the door depicted on the floor plan, as the door the team had originally intended to enter. See, *Valley Deposition,* at 54–56.

8. The St. Louis County entry team denies using, or hearing, any vulgar language having been exchanged between the men and the women, see, *Mettler Deposition,* at 25; *Zebro*

*Deposition,* at 28; *Peterson Deposition,* at 23; *Hohman Deposition,* at 14, 19; *Scott Deposition,* at 34; *Cuffe Deposition,* at 43, but, as we are considering Motions for Summary Judgment, we must take the facts in a light most favorable to the non-moving parties—here, the Plaintiffs'—and we will assume that the officers were as vulgar as the Plaintiffs have described them.

ripped from her hands, and she was pushed to the center of the room. *Id.* at 47. She also testified that there was a lot of yelling going on. The men pushed her to the ground, patted her, and then said "You're done." *Id.* at 50. She thought, at that point, that she must have been involved in a mixed-up training scenario. *Id.* at 51. She testified that the men were angry, and that, when she attempted to advise Wilson, and Schafroth, who were in the adjoining office, that everything was okay, she was restrained from doing so. *Id.*

Miskovich remembered seeing the men in the hallway, and she believed that, when asked by Schafroth whether they needed any help, one of the men commented that they were just playing "f* *king games." *Miskovich Deposition,* at 18. Miskovich testified that, at that point, she believed something was wrong. *Id.* at 18–19. Thereafter, Miskovich ran from the observation room into the office, where she told Wilson to get under the desk, and hid herself under the desk. *Id.* at 27; *Wilson Deposition,* at 28. A man then came into the room, and stated "I have two more back here, I need help." *Miskovich Deposition,* at 27; *Wilson Deposition,* at 32. Two more men came into the office, and said, "We know you're back here. Get out." They were also yelled profanities. See, *Miskovich Deposition,* at 27; *Wilson Deposition,* at 32. Miskovich has claimed that she asked one of the officers who they were, but that she did not receive an answer. *Miskovich Deposition,* at 28; see also, *Wilson Deposition,* at 33.

Both Miskovich, and Wilson, got onto the floor at the officers' direction, and one of the men placed his foot on Miskovich's back, with his gun pointed at her head. See, *Miskovich Deposition,* at 28; *Wilson Deposition,* at 33. The man with his foot on Miskovich's back did not cause Miskovich any physical pain, or bruises. See,

*Miskovich Deposition,* at 31. Another man, who was in the hallway, yelled that help was needed out there. Both women heard an argument, and the sounds of a struggle, from the hallway, and somebody—identified by Wilson as Marty—saying "they're not involved, they're not involved." *Miskovich Deposition,* at 32; *Wilson Deposition,* at 34.

At some point, apparently when the man restraining her was distracted by the scuffle in the hallway, Miskovich got off the ground, and started to leave, but was told to "F* * *ing stop." *Miskovich Deposition,* at 34. She was escorted back, and she asked the man what he was doing, or what he wanted, but again, she received no response. *Id.* As for Wilson, she explained that one of the men touched her, and said "you're done," and then repeated it to her. *Wilson Deposition,* at 35. She testified that the man did not seem angry, and that the touch was not violent. *Id.* at 38.

The recollections of these events by Cuffe, Hohman, and Mettler, are far different than those of the women, see, *Mettler Deposition,* at 23–26; *Hohman Deposition,* at 18–22; *Cuffe Deposition,* at 39–48, but, for the purposes of these dispositive Motions, we take the facts in the light most favorable to the non-moving party—the Plaintiffs. Nevertheless, Hohman testified that he thought all of the women appeared genuinely surprised, and Cuffe remembered that the woman, who was hiding under the desk, appeared to be afraid. *Hohman Deposition,* at 15; *Cuffe deposition,* at 42. In fact, according to the reports that have been prepared by Cuffe, Hohman, Peterson, and Scott, soon after the incident, following the first interaction with one of the women, the team leaders made "an initial determination * * * that th[o]se parties perhaps were not advised of our presence for the training scenario." *Report Prepared by Timothy Peterson,*

*Ex. GG to Affidavit of John D. Undem* ("Peterson Report"); see also, *Report Prepared by Ronald Hohman, Ex. HH to Affidavit of John D. Undem* ("Hohman Report")("At this time our team leaders, Joe Zebro and Bernie Metler [sic], decided that * * * th[o]se females may not be part of the scenario."); *Report Prepared by Michael A. Scott, Ex. II to Affidavit of John D. Undem* ("Scott Report")("At this time there was a decision made by Team Leaders Joe Zebro and Bernie Mettler that we were possibly in the wrong part of the school and that th[o]se people may not be involved in the scenario."); *Report Prepared by Jerry Cuffe, Ex. KK to Aff. of John D. Undem* ("At this time, entry team m[embers] had their weapons drawn and pointed at occupants of the school, and there was an initial determination made by team leaders present, Deputies Joe Zebro and Bernie Mettler, that th[o]se parties perhaps were not advised of our presence for the training scenario.").

After receiving the call from Schafroth, which was cut short by the officer who stormed the room in which she was located, Marty left his office, but did not tell his assistant, Lien, to call 911. See, *Lien Deposition,* at 14. Thereafter, as Peterson, Scott, and Zebro, were proceeding down the hallway, a male—Marty—came around a corner, and began advancing toward them in the hallway. See, *Zebro Deposition,* at 29; *Peterson Deposition,* at 24; *Scott Deposition,* at 36. Peterson and Scott pointed their weapons at Marty, and began shouting commands that he stop and comply with their orders. *Peterson Deposition,* at 24; *Scott Deposition,* at 36. Marty refused to do so, and instead, began yelling at the officers, and telling them to get the "f* *k" out of the building. *Peterson Deposition,* at 24; *Scott Deposition,* 36. Scott and Peterson pushed Marty up against the lockers, and were bringing him under control, when Zebro moved up and began speaking with Marty. See, *Zebro*

*Deposition,* at 30. Either Zebro, or Scott, asked Marty whether he was aware that a training exercise was in progress, to which Marty replied that he was not. See, *Zebro Deposition,* at 30; *Scott Deposition,* at 38. Zebro testified that he then apologized to Marty, and to the Plaintiffs, and allowed them to leave the building unescorted. *Zebro Deposition,* at 29–32. The Plaintiffs have denied that any apology was given.

According to the Plaintiffs, once they were secured in the Reif Center observation room, and office, they were escorted out of the building, and were led, at gun point, to a grassy area behind the Reif Center. See, *Schafroth Deposition,* at 54; *Wilson Deposition,* at 41–42. Akerson confirmed that the three women did exit the building, although he testified that they were not escorted and, since he assumed that they were a part of the scenario, he started issuing commands, such as telling them to keep their hands up. *Akerson Deposition,* at 22. Akerson did have his gun pointed at them. *Id.* at 39. They were led to a female Reserve Officer, who told them to sit on the ground. See, *Schafroth Deposition,* at 55; *Miskovich Deposition,* at 35; *Wilson Deposition,* at 43. The Reserve Officer was apparently Akerson's partner, Heinrich. See, *Akerson Deposition,* at 22; *Heinrich Deposition,* at 21–22, 26. Heinrich reported that Akerson had told her to keep her gun on the women, and that the women appeared upset. *Heinrich Deposition,* at 26–28. Neither Schafroth, Miskovich, nor Wilson, specifically re-called Heinrich having a gun, however. See, *Schafroth Deposition,* at 56; *Miskovich Deposition,* at 42; *Wilson Deposition,* at 43.

After directing the women toward Heinrich, Akerson saw a male leave the building, who was yelling "they weren't f* *king involved." *Akerson Deposition,* at 40; *Report Prepared by Jason Akerson,*

*Ex. JJ to Aff. of John D. Undem* ("Akerson Report"). Otherwise, Akerson testified that no one came out of the building, and advised him that the women were not involved in the scenario. *Id.* At some point thereafter, the Plaintiffs were released.

After the confrontation with the Plaintiffs, and Marty, one of the team members radioed the occurrence of the encounter to the Command Center, and advised, in specifics, that the team had encountered three females, and a male, who were administrative personnel, and who appeared to be unaware of the training scenario. See, *St. Louis County ERT Log.* The Command Center received the call at 10:30 o'clock a.m. *Id.*

On the basis of this Record, the Plaintiffs have asserted the following claims against St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, Zebro, and Grand Rapids: a claim under Title 42 U.S.C. § 1983 for violation of their rights under the Fourth and Fourteenth Amendments, as well as claims, under State law, for an intentional infliction of emotional distress, a negligent infliction of emotional distress, assault, battery, and false imprisonment. See, *Amended Complaint,* Civ. No. 00–1944 [Docket No. 28]; *Second Amended Complaint,* Civ. No. 01–824 [Docket No. 9]. Miskovich has also sued the Reif Center, and Marty, for both a negligent and an intentional infliction of emotional distress. See, *Amended Complaint,* Civ. No. 00–1944. Additionally, St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, have sued the Reif Center, and Marty, for contribution, in the case commenced by Schafroth and Wilson, claiming that, if the Defendants are found liable, on any of the claims asserted by Schafroth and Wilson, it would be because the Reif Center, and Marty, had failed to warn the Plaintiffs about the training scenario. See,

*Third–Party Complaint,* Civ. No. 01–824 [Docket No. 10]. All of the Defendants, and Third–Party Defendants, now seek Summary Judgment on each of the claims, and the Plaintiffs seek leave to amend their respective Complaints.

### III. *Discussion*

St. Louis County, Grand Rapids, and the individually named officers, seek Summary Judgment based on a variety of immunity defenses, while the Reif Center, and Marty, seek the same relief on the Plaintiffs' claims of a negligent infliction of emotional distress. First, we outline the standard of review which governs our analysis, and then address the Motions individually.

### A. *Standard of Review.*

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Duffy v. McPhillips,* 276 F.3d 988, 991 (8th Cir.2002); *Schoolhouse, Inc. v. Anderson,* 275 F.3d 726, 728 (8th Cir.2002); *Krentz v. Robertson Fire Protection Dist.,* 228 F.3d 897, 901 (8th Cir. 2000); *Curry v. Crist,* 226 F.3d 974, 977 (8th Cir.2000); *Carter v. St. Louis Univ.,* 167 F.3d 398, 400 (8th Cir.1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance Co.,* 207 F.3d 1026 (8th Cir.2000); *Austin v. Minnesota Mining and Mfg. Co.,* 193 F.3d 992, 995 (8th Cir. 1999); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl,* 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.,* 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1085 (8th Cir.1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Center, Inc.,* 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

B. *Legal Analysis.*

1. *The Motions of St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, for Summary Judgement, and the Counter Motion of the Plaintiffs to Amend their Complaints.*

St. Louis County, and the St. Louis County ERT team, move for Summary Judgment on the Plaintiffs' Federal causes of action, by asserting that the claims are barred by *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and the doctrine of qualified immunity. Further, they contend that the State causes of action—negligent and intentional infliction of emotion distress, assault, battery, and false imprisonment—are barred by the doctrines of official immunity, vicarious official immunity, and statutory immunity, under Minnesota Statutes Section 466.03, Subdivision 6. Finally, Peterson, and Scott, claim that, since they had no contact with the Plaintiffs, they cannot be liable for any injuries. We first address the asserted defenses to the Federal cause of action, and then turn to the State causes of action.

a. *The Plaintiffs' Federal Claims Under Section 1983.*

■ The Plaintiffs claim that St. Louis County, and the St. Louis County ERT members, deprived them of their rights, under the Fourth Amendment, to be secure from unreasonable search and seizure, and from excessive use of force. As a consequence, they have brought this action under Section 1983.

■ Insofar as the Plaintiffs' claims relate to St. Louis County, it is clear that they can not sustain their action. It is well settled that, under *Monell v. Department of Social Servs.,* supra at 691, 98 S.Ct. 2018, a County "cannot be held liable

solely because it employs a tortfeasoror, in other words, a [County] cannot be held liable under § 1983 on a respondeat superior theory." Of course, the governmental entity may be held liable, under Section 1983, if the execution of its policy, or custom, resulted in a deprivation of a constitutional right. *Id.* at 694, 98 S.Ct. 2018; *see also, McMillian v. Monroe County,* 520 U.S. 781, 783, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)(determining that a County is liable, under Section 1983, for the actions of its Sheriff which constitute County policy); *Yellow Horse v. Pennington County,* 225 F.3d 923, 928 (8th Cir.2000)("[A] municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality"); *McGautha v. Jackson County,* 36 F.3d 53, 56 (8th Cir.1994)("Respondeat superior does not apply under section 1983 because municipal liability is limited to conduct for which the municipality is itself actually responsible.").

Here, however, the Plaintiffs' Complaints are devoid of any allegation that a policy or custom, of St. Louis County, caused the Plaintiffs' injuries, nor have the Plaintiffs proffered any evidence of such a policy or custom. Thus, it is clear that their causes of action, against St. Louis County, cannot survive, and we grant St. Louis County's Motion for Summary Judgment on the Plaintiffs' Section 1983 claims.

■ As to the individually named St. Louis County ERT members, they first argue that the Plaintiffs have not sued them in their individual capacities, and that, therefore, the Section 1983 claims must be dismissed. At the outset, we note that the Plaintiffs have agreed that Peterson, and Scott, did not have any direct contact with the Plaintiffs during the events of July 14, 1999, see, *Peterson Deposition,* at 22–25; *Scott Deposition,* at 34–39, and as a result, they concede that a dismissal of the Section 1983 claim, as

against those two Defendants, is warranted. See, *Plaintiffs' Memorandum in Response to St. Louis County, et al.'s Motion for Summary Judgment,* at 26. Therefore, we grant Summary Judgment to Peterson, and Scott, on the Plaintiffs' Section 1983 claims.

■ Although the Plaintiffs can sue the remaining, individually named St. Louis County officers, in either their official and/or their individual capacities, see, *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir.1999), under Section 1983, a suit against an officer in his official capacity is construed as a suit against the governmental entity—in this case, against St. Louis County. See, *Reehten v. Buck,* 163 F.3d 602, 1998 WL 738329 at *1 (8th Cir.1998)("[The plaintiff's] official-capacity action against the three defendants amounts to an action against their municipal employer, St. Louis County.")[Table Decision]; *Doe v. Washington County,* 150 F.3d 920, 923 (8th Cir.1998)("A suit against a county official in his official capacity is the equivalent of a suit against the county itself.").

As we have already observed, however, a governmental entity, such as a County, can only be sued under Section 1983 for its unconstitutional policy, or custom. See, *Monell v. Department of Social Servs.,* supra at 694, 98 S.Ct. 2018; see also, *Reehten v. Buck,* supra (construing Complaint, that did not specify whether officers were sued in their official or individual capacity, as an official capacity Complaint, and affirming the dismissal of the Complaint because it failed to plead an unconstitutional policy or custom); *Lopez–Buric v. Notch,* 168 F.Supp.2d 1046, 1049 (D.Minn.2001)("[A] § 1983 suit against the governmental entity employer is considered to be a *Monell* claim."). Therefore, unless the officers have been sued in their individual capacities, the Section 1983

claims must be dismissed because of the Plaintiffs' failure to allege an unconstitutional policy or custom. See, *Lopez–Buric v. Notch,* supra at 1049.

■ As our Court of Appeals has often held, "in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." *Johnson v. Outboard Marine Corp.,* supra at 535, and cases cited therein; see also, *Egerdahl v. Hibbing Comm. College,* 72 F.3d 615, 619 (8th Cir.1995)("If a plaintiff's complaint is silent about the capacity in which she is suing the defendant, we interpret the complaint as including only official capacity claims."). Moreover, the Court has plainly placed litigators on notice as to how to properly plead the individual capacity of a State actor, by instructing that "Section 1983 litigants wishing to sue government agents in both capacities should simply use the following language: 'Plaintiff sues each and all defendants in both their individual and official capacities.'" *Nix v. Norman,* 879 F.2d 429, 431 (8th Cir.1989). "This is not a burdensome requirement * * *." *Lopez–Buric v. Notch,* supra at 1050. The requirement is necessary in order to place defendants on notice that they are being sued in their personal capacity. See, *Johnson v. Outboard Marine Corp.,* supra at 535.

Nonetheless, "when a complaint is otherwise sufficient to put governmental officials on notice that they are being sued personally, the Eighth Circuit has permitted the plaintiff's individual capacity claims to proceed." *Helseth v. Burch,* 109 F.Supp.2d 1066, 1073 (D.Minn.2000), rev'd on other grounds, 258 F.3d 867 (8th Cir. 2001), citing *Jackson v. Crews,* 873 F.2d 1105, 1107 (8th Cir.1989). In *Helseth,* the Court went on to analyze the Complaint, in order to determine whether it placed the

defendants on notice, even though the caption of the Complaint did not specifically state that the defendants were being sued in their individual capacities. In particular, the Court noted that the plaintiff structured his Complaint in such a way that the "only reasonable interpretation of it is that it asserted claims against [the defendant] in his individual capacity." *Id.* at 1074. Specifically, the plaintiff separated the claims he had between the individual official, and the municipality, and only claimed punitive damages against the individual official, which was notable because punitive damages could not· be claimed against governmental agencies. *Id.* at 1073, citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Moreover, the Court noted that the individual defendant must have known that he was being sued in his individual capacity, as he retained separate counsel. *Id.* at 1074.

■ None of the factors, which were recognized in *Helseth,* as disclosing an intent to plead claims against the defendants individually, are present here. The Complaints do not unambiguously state that the individual Defendants were being sued in either their official or individual capacities and, beyond initially identifying the Defendants, the Complaints do not differentiate between St. Louis County, Grand Rapids, or the separately named St. Louis County Defendants. See, *Amended Complaint,* Civ. No. 00–1914; *Second Amended Complaint,* Civ. No. 01–824. For the most part, the Complaints consistently identify the separately named St. Louis County Defendants as "employees," or they denote them as "defendant law enforcement officers." See, *Amended Complaint,* at & & VI–VII, XII–XV, Civ. No. 00–1944; *Second Amended Complaint,* at & & IV–V, IX–XII, Civ. No. 01–824. Finally, there is no ·claim ·for punitive damages in these

actions, which could have been placed the Defendants on notice that they were being sued in their individual capacities. See, *Lopez–Buric v. Notch*, supra at 1050 (noting the language used in the Complaint, and the fact that the plaintiff did not pursue punitive damages, demonstrated that the complaint only evidenced a suit against the defendant in his official capacity). Thus, we conclude that the Complaints did not "expressly and unambiguously" place the Defendants on notice of their potential personal liability.

■ Here, however, the Plaintiffs have filed a Motion to Amend their Complaints, so as to assert, clearly, a claim against the Defendants in their individual and official capacities. We conclude that, under the circumstances of this case, we are well within our discretion to grant the Plaintiffs' Motions to Amend the Complaint. See, e.g., *Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir.1997). In *Murphy*, our Court of Appeals concluded that the plaintiff's complaint contained "no * * * clear statement" that the officials were being sued in both their individual and official capacities. *Id.* at 754. There, the defendants filed a Motion for Summary Judgment, based upon the Eleventh Amendment, and the plaintiff responded with a Motion to Amend. *Id.* The District Court did not rule on the Motion to Amend, but denied the defendants' Motion for Summary Judgment, stating that the "defendants cannot seriously argue that they had no notice that they were sued in [their] individual capacities." *Id.* at 754–55. On appeal, the Court upheld the denial of Summary Judgment, reasoning as follows:

> Though the district court erred in excusing Murphy's failure to clearly assert personal capacity claims in his initial complaint, that does not resolve the issue. When defendants sought summary judgment on this ground, Murphy moved to amend his complaint. The

district court has not ruled on that motion, which is committed to its sound discretion. See *Nix* [*v. Norman* ], 879 F.2d at 433, n. 3. Given the district court's conclusion that defendants had sufficient notice they were being sued in their personal capacities, we are confident that the district court would grant Murphy leave to amend the complaint to state personal-capacity * * * claims.

*Id.*

We similarly conclude that, notwithstanding the absence of expressly designated individual capacity claims, the Defendants were on notice that they were being sued in their individual, and official capacities. In their Answer to both Complaints, St. Louis County, and the specifically named St. Louis County ERT officers, pled qualified immunity as a defense against the constitutional claims. See, *Answer*, at 3–4, Civ. No. 00–1944 [Docket No. 29]; *Amended Answer*, at 3, Civ. No. 01–824 [Docket No. 2]. However, if these Defendants had been sued only in their official capacities, then the defense of qualified immunity would be unavailable to them, as "[q]ualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacities." *Johnson v. Outboard Marine Corp.*, supra at 535; see also, *Helseth v. Burch*, supra at 1074 (noting that the defendant "focuse[d] his defense on the doctrine of qualified immunity"). Moreover, there is nothing in the Defendants' respective Answers which would alert the Plaintiffs, that the Defendants believed that they were only being sued in their official capacities. See, *Lopez–Buric v. Notch*, supra at 1051 (noting that defendant's answer to the Complaint asserted that the defendant "was acting in his official capacity at all times relevant hereto, and all claims asserted against the municipal defendants are official capacity claims").

Finally, we note that these Defendants have admitted that there would be no prejudice if we were to allow the Plaintiffs to amend their Complaints. There is no suggestion that the proposed amendment would cause additional discovery to be taken, and although the St. Louis County Defendants did intimate a potential conflict of interest between Lehman, and the other St. Louis County ERT members, St. Louis County confirmed that there was no question that the County would indemnify the officers.[9] Therefore, we conclude that, on this Record, the Plaintiffs' Motions to Amend should be granted, which will cure their failure to specifically allege the claims against the officers, in both their individual and official capacities. Conversely, we deny the Motions of Akerson, Cuffe, Hohman, Lehman, Mettler, and Zebro, for Summary Judgment on the Section 1983 claims, on lack of individual capacity grounds.

 Lastly, Akerson, Cuffe, Hohman, Lehman, Mettler, and Zebro, contend that the Plaintiffs' claims against them, under Section 1983, must be dismissed, as they are entitled to qualified immunity. Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See, *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Young v. Harrison*, 284 F.3d 863, 866 (8th Cir.2002); *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir.2001). In order "[t]o withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time

of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir.1999); see also, *Young v. Harrison*, supra at 866–67.

 "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Wilson v. Layne*, supra at 614, 119 S.Ct. 1692. The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, "A[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir.1996).

Here, the Plaintiffs argue that their rights, which were violated by the Defendants, and which were clearly established at the time of the incident, were the right against unlawful seizure, as guarded by the Fourth Amendment, and their right to be free from excessive use of force, as also protected by the Fourth Amendment. Although the Defendants respond, that these

---

9. Any potential conflict of interest between Lehman, and the other officers, is resolved by our grant of Lehman's Motion for Summary Judgment, as we later explain in the text of this Order.

rights were not clearly established in the context of a case such as the one at hand, we cannot agree.

Our Court of Appeals has conclusively determined, well before the incident at issue in this case, that " 'whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person * * * and the Fourth Amendment requires that the seizure be reasonable.' " *Fields v. City of Omaha*, 810 F.2d 830, 834 (8th Cir.1987). More recently, the Court reaffirmed, that a person is "seized" when police engage "in conduct that would make a reasonable person feel he was not free to leave." *Mettler v. Whitledge*, supra at 1203, and cases cited therein. Such a seizure, assuming it is not predicated on probable cause, is reasonable if it is founded upon a reasonable suspicion, *id.*, or, as more recently determined, upon a "community caretaking function." [10] *Winters v. Adams*, supra at 764. There is no contention that probable cause, reasonable suspicion, or community caretaking, was present here and, taking the facts in a light most favorable to the Plaintiffs, there can be no doubt that the women felt they were in police custody—not free to leave—when they were confronted by Cuffe, Hohman, Mettler, and Zebro. On these facts, assumed in a light that favors the Plaintiffs' contentions, there can be no responsible contention that the Plaintiffs' right against an unreasonable seizure was not clearly established at the time of the July 14 incident.

■■■ Moreover, as our Court of Appeals clearly stated, in January of 1999, "[t]he Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers," a precept that was established by the Supreme Court in 1989. *Mettler v. Whitledge*, supra at 1202, citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The test for determining whether force was excessive is "whether the amount of force used was objectively reasonable under the particular circumstances." *Winters v. Adams*, supra at 766, quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir.1994). The factors, which must be considered in determining the presence of excessive force, include "the severity of the suspected crime, whether the suspect posed an immediate threat to the officer or others, and whether the suspect was actively resisting arrest." *Goff v. Bise*, 173 F.3d 1068, 1073 (8th Cir.1999). Of course, "this generalized right to be free from an unreasonable use of excessive force during a police seizure does not clearly establish a right for purposes of a qualified immunity analysis." *Mettler v. Whitledge*, supra at 1202–03. Rather, a plaintiff "must show the right was clearly established in a particularized sense relevant to the case at hand." *Id.* at 1203.

Construing, as we must, the facts in favor of the Plaintiffs, the particular circumstances of this case show that Cuffe, Hohman, Mettler, and Zebro, without probable cause, reasonable suspicion, or some other lawful basis, seized the Plaintiffs and, in doing so, used weapons, a bunker shield, physical touching, and commands to effectuate the seizure. While we

---

10. The "community caretaking" function appears to be an alternative to the requirement of reasonable suspicion established in *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See, *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir.2001). In *Winters*, the Court determined that, under certain circumstances, apart from detection, investigation, or the collection of evidence relating to a crime, officers can conduct a limited stop of an individual " 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.' " *Id.* at 763, quoting *United States v. King*, 990 F.2d 1552, 1560–61 (10th Cir.1993).

understand these Defendants to contend, that they believed that they had the implied consent of the individuals to conduct the seizures, and exercise the force complained of here, we cannot say that the evidence would not support the Plaintiffs' theory, that these officers determined, prior to accosting the Plaintiffs, that they were not in the correct building, and that the women did not know about the training. According to the Plaintiffs, despite these realizations, the officers, for reasons known but to them, decided to treat the Plaintiffs as though they were actors in the exercise scenario.

Of course, for these purposes, we need not find—and we do not find—that the officers had any ill-will toward the Plaintiffs, by the actions that the officers took on July 14. The Record before us could as easily—or, perhaps, more easily—support the officers' contention, that the best laid of plans went miserably awry, and that they innocently, but wrongly, believed that the Plaintiffs were a part of the training scenario. Cf., Robert Burns, *To a Mouse* (1785). No matter how implausibly, however, we might regard the Plaintiffs' theory to be-namely, that the officers purposefully violated their Fourth Amendment rights, as an act of tyranny, if not of testosterone gone mad,[11] the crux of the issue before us is not one involving the application of law to undisputed facts, but one involving a critical ascertainment of believability.

However, "[a]t the Summary Judgment state, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Peter v. Wedl,* supra at 996, quoting *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); see also, *Anderson v. Liberty Lobby, Inc.,* supra at 249, 106 S.Ct. 2505 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Hedges v. Poletis,* 177 F.3d 1071, 1074 (8th Cir.1999) ("When evaluating a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party and refrain from assessing credibility."). "[I]n order to defeat a motion for qualified immunity, it need only be permissible for a reasonable finder of fact based on the evidence and on the finder of fact's assessment of witness credibility to conclude that the [alleged violation of the Plaintiffs' Fourth Amendment right] was objectively reasonable." *Ribbey v. Cox,* 222 F.3d 1040, 1043 (8th Cir.2000). Accordingly, we deny the Motion for Summary Judgment by Cuffe, Hohman, Mettler, and Zebro, on the basis of qualified immunity, and we proceed to the Motions for the same relief by Akerson and Lehman.

As to Akerson, and Lehman, we are presented with significantly different facts. Lehman was not involved in, and did not witness or approve, the actual seizure of the Plaintiffs and, in no way, did he employ and direct use of force against them. Moreover, the Plaintiffs have not alleged any other clearly established constitutional, or Federal statutory right, that the Plaintiffs hold, or that Lehman is alleged to have violated. See, *Otey v. Mar-*

---

11. While almost unthinkable, we cannot exclude the possibility, given the testimony of the Plaintiffs, that the officers in question, for fear that the Plaintiffs were a part of the scenario, and that their being duped by them would be a matter of peer derision, or that, having been thoroughly frustrated by the uncertainty posed by their location in an area in which, perhaps, they should not have been, they vented their frustrations upon the Plaintiffs. While we are dubious that a Jury would conclude that such a near unthinkable circumstance occurred, that is the Jury's function, and not ours on Summary Judgment.

*shall*, 121 F.3d 1150, 1155 (8th Cir.1997)(stating, in regard to a claim against a Chief of Police, which stemmed from a shooting by one of his officers, "[t]o overcome Chief Smith's entitlement to qualified immunity, the appellee must allege, and present evidence that could support, that Chief Smith himself violated a well-established constitutional right of [the plaintiff's]"). In short, "Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." *Id.* at 1155.

■ Although the Plaintiffs have not specifically delineated the bases for suing Lehman under Section 1983, they appear to contend that Lehman failed to properly train, or supervise, the entry team. See, *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir.2001)(stating that a supervisor is subject to Section 1983 liability only if he directly participated in the constitutional violation or if his failure to train or supervise the offending employee caused a violation of the constitutional right); *Otey v. Marshall*, supra at 1155. In order to show that Lehman failed to supervise the Defendants, they Plaintiffs must show that Lehman:

(1) Received notice of a pattern of unconstitutional acts committed by subordinates;

(2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

(3) Failed to take sufficient remedial action; and

(4) That such failure proximately caused injury to [the Plaintiffs].

*Otey v. Marshall*, supra at 1155, quoting *Jane Doe v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 645 (8th Cir.1990); see also, *Audio Odyssey, Ltd. v. Brenton First National Bank*, 245 F.3d 721, 742 (8th Cir.2001).

Here, there has been no evidence, that has been proffered by the Plaintiffs, or any other party, that Lehman had received notice of his officers' propensity to commit unconstitutional acts. Therefore, we conclude that the Plaintiffs have not sustained their burden to divest Lehman of his entitlement to qualified immunity on a failure to supervise claim.

■ As to a failure to train contention, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *Otey v. Marshall*, supra at 1156, quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Thus, as our Court of Appeals has observed:

It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the city had notice that it procedures were inadequate and likely to result in a violation of constitutional rights.

*Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir.1996)[internal quotations and citations omitted].

Once again, however, the Plaintiffs have made no showing of a deficiency in the training of the members of the St. Louis County ERT team. Therefore, we conclude that Lehman is entitled to qualified immunity, and we grant his Motion for Summary Judgment on the Plaintiffs' Section 1983 claims.

■ Finally, with respect to Akerson, we will assume that he violated a clearly established right of the Plaintiffs, when he escorted them, at gun point, from the Reif

Center to Reserve Officer Heinrich. However, it is clear that a reasonable officer, in Akerson's position, would not have known that he was violating the Plaintiffs' rights. The Plaintiffs have identified nothing in this Record which would so much as suggest that Akerson knew they were not involved in the training scenario. Unlike Cuffe, Hohman, Mettler, and Zebro, Akerson was not a part of the St. Louis County ERT entry team, but rather, was maintaining a post on the inner perimeter of the school. See, *Akerson Deposition,* at 16. As Akerson explained in his report, his "assignment was to watch for any students or people running from or leaving the building as part of the scenario and to detain th[o]se people." *Akerson Report.*

As a consequence, Akerson was not involved in the apparent discussion, between Mettler and Zebro, concerning the possible mistaken entry into what they later learned was the Reif Center, or the noninvolvement of the Plaintiffs in the scenario. See, *Peterson Report; Hohman Report; Scott Report; Cuffe Report.* Moreover, when the St. Louis County ERT entry team exited the Reif Center the first time, in order to ascertain the correct entrance, Akerson did not address the situation with them, nor did overhear them engaged in such a discussion, as there is no evidence to the contrary. Even assuming that Akerson heard the radio communication, between the entry team and the Command Center—in which the entry team advised that they had entered the wrong door,[12] see, *St. Louis County ERT Log* (log entry at 10:27 o'clock a.m.)—there is no evidence that there was a conversation about the occupants in the building, or the reason the entry team felt that they had entered the wrong building. On the Record before us, Akerson only saw the entry team leave the building, try other doors, and ultimately decide to reenter the building through the same door. See, *Akerson Deposition,* at 18.

Nor is there any evidence that, after the women were escorted from the Reif Center, and Akerson trained his gun on them, he was advised by anyone—either the Plaintiffs or another officer—that the Plaintiffs were not a part of the scenario. *Id.* at 40. Akerson testified that he did not hear anyone from the entry team state that the women were not involved in the scenario, or that the entry team had entered the wrong building. *Id.* at 42. Akerson was of the mind-set, which is not contradicted by any evidence, that all of the individuals were either involved in the exercise, or were aware of the exercise, and would advise him, that they were not involved, if confronted. *Id.* at 7.

Consequently, as the Plaintiffs filed out of the building, Akerson reasonably assumed they were part of the exercise, and he treated them as such. We can find nothing objectively unreasonable in these actions, nor could a reasonable fact finder. Thus, we conclude that, even if Akerson violated a clearly established right of the Plaintiffs', a reasonable officer in his position would not have known that he was violating their rights, and he is, therefore, entitled to Summary Judgment based on qualified immunity, and we grant his Motion for Summary Judgment.

b. *The Plaintiffs' State Law Claims.*

The Plaintiffs assert claims of negligent and intentional infliction of emotional distress, assault, battery, and false imprisonment, against St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peter-

---

12. Akerson did not know the entry team had communicated with the Command Center, by radio, about the locked door, nor is there any evidence suggesting that he heard the communication, or was forgetful in not recalling that communication. *Akerson Deposition,* at 18.

son, Scott, and Zebro. In turn, these Defendants move for Summary Judgment on the grounds that they are entitled to official immunity, vicarious official immunity, and statutory immunity. In addition, Peterson and Scott contend that they are entitled to Summary Judgment because they had no contact with the Plaintiffs at any time during the training exercise. We agree with the Defendants, but only in part, and we address each of their defenses separately.

1. *Official Immunity.* First, the separate St. Louis County Defendants urge that they are entitled to official immunity. In Minnesota, governmental employees are entitled to immunity when they are performing discretionary functions. See, e.g., *Kuha v. City of Minnetonka*, 176 F.Supp.2d 926, 934 (D.Minn. 2001) (applying Minnesota law); *Janklow v. Minnesota Bd. of Examiners*, 552 N.W.2d 711, 715–16 (Minn.1996). As government employees, they are "accorded near complete immunity for their actions in the course of their official duties, so long as they do not exceed the discretion granted them by law." *Janklow v. Minnesota Bd. of Examiners*, supra at 716. Such official immunity is intended 'to protect public officials from the fear of personal liability that might deter independent action.' *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn.App.2001), rev. denied (Minn. February 28, 2002).

As a result, the heart of our analysis, under a claim of official immunity, is the nature of the governmental action; that is, was the act discretionary or ministerial. "[I]n analyzing any immunity question it is essential to identify the precise governmental conduct at issue." *Watson v. Metropolitan Transit Commission*, 553 N.W.2d 406, 415 (Minn.1996). Discretionary decisions are those which involve the exercise of judgment or discretion. See, *Johnson v. Morris*, 453 N.W.2d 31, 41

(Minn.1990); *Mowatt v. Hennepin County*, 2002 WL 857733 at *4 (Minn.App. May 7, 2002) (stating that discretionary acts are those that involve "the exercise of individual judgment in carrying out official duties") [unpublished decision]. In contrast, ministerial decisions, which are the types of decisions that are absolute, certain, and imperative, and involve merely the execution of a specific duty which arises from fixed and designated facts, see, *Rico v. State*, 472 N.W.2d 100, 107 (Minn.1991), are not immune to suit. "Some degree of judgment and discretion will not necessarily confer discretionary immunity on an official; the crucial focus is upon the nature of the act." *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn.1988).

The categorization of an act as discretionary or ministerial is a legal question, which the Court determines. See, *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 (Minn.1999). In making this determination the Court [should] keep[ ] in mind that official immunity, 'protects public officials from the fear of personal liability that might deter independent action and impair the effective performance of their duties.' *Kuha v. City of Minnetonka*, supra at 934, quoting *Elwood v. County of Rice*, supra at 677.

Generally, "[a] police officer who performs his or her duty to prevent crime and enforce the law is not * * * acting in a ministerial capacity, but is usually exercising discretion." *Kuha v. City of Minnetonka*, supra at 934; see also, *Watson v. Metropolitan Transit Commission*, supra at 415; *Johnson v. Morris*, supra at 41. Rather, "[o]nly when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence." *Watson v. Metropolitan Transit Commission*, supra at 415. The Court, in *Kuha*, explained the reasoning for such a rule, as follows:

Official immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a third person might be injured would * * * tend to exchange prudent caution for timidity in the already difficult job.

*Kuha v. City of Minnetonka*, supra at 934–35.

Here, the Plaintiffs claim that the St. Louis County officers' actions were ministerial, as this was a "training exercise where the officers had previously decided that the Plaintiffs were non-participants," and thus, "[a]t this point the officers' duty becomes ministerial—they have no reason nor justification for confronting innocent citizens at gunpoint, screaming vulgarities at them and detaining them." *Plaintiffs' Memorandum in Response to St. Louis County, et al.'s Motion for Summary Judgment*, at 22. Rather, the Plaintiffs argue, "[t]he officers' duty, once a determination was made that Plaintiffs were not involved in the training scenario, was absolute, certain and imperative." *Id.*

 We need not determine whether the actions of Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, were discretionary, or were ministerial, for purposes of their claim of official immunity, as we conclude that there is a genuine issue of material fact as to whether these officers acted with malice. In addition to the fact, that ministerial decisions are not protected by official immunity, the immunity can also be eviscerated when the plaintiff alleges, and proves, that the official acted willfully and maliciously. See, *Kuha v. City of Minnetonka*, supra at 934, *Kelly v. City of Minneapolis*, supra at 663. The Minnesota Supreme Court has stated that willful, or malicious conduct, is the "intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Kelly v. City of Minneapolis*, supra at 663, quoting *Rico v. State*, supra at 107. Stated otherwise, "[m]alice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." *Id.* at 664. The question of malice is an "objective inquiry into the legal reasonableness of an official's actions." *Dokman v. County of Hennepin*, supra at 288, quoting *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn.1994).

As we have previously explained, in the context of certain of the Defendants' claims to qualified immunity, when we view the evidence in a light most favorable to the Plaintiffs, we are unable to find the absence of a genuine issue of material fact as to whether these Defendants acted with malice.[13] Rather, the reports of Cuffe,

**13.** We recognize that Scott, and Peterson, were not implicated in our prior discussion concerning the actions of the St. Louis County ERT entry team, and we are mindful that they had requested Summary Judgment based on the fact that they did not interact with the Plaintiffs at any time. See, *Peterson Deposition*, at 22–25; *Scott Deposition*, at 34–39. However, as we have already noted, both Peterson, and Scott, reported that there had been a previous decision by Zebro, and Mettler, that the Plaintiffs were either not involved in the scenario, or were unaware of it. See, *Peterson Report; Scott Report*. Nevertheless, without any apparent questioning of the propriety of treating the women as participants in the training, they went along with their team members, and entered the building. Although they, then, went down the hallway, instead of into the rooms containing the Plaintiffs, we find it disturbing that, if the Plaintiffs version of the facts are accepted as true, Scott and Peterson would not have acted to stop their fellow team mates. Thus, while it is true that they did not directly confront the Plaintiffs, and in no way accosted them, viewing the facts in the light most favorable to the Plaintiffs, we conclude that Scott, and

Hohman, Peterson, and Scott, explain that Mettler, and Zebro, made a determination, after the team had initially entered the building that they later learned was the Reif Center, that they were in the wrong building, and that the women in the building were not involved in the training, or were not "advised" of the exercise. See, *Peterson Report; Hohman Report; Scott Report; Cuffe Report.* Nonetheless, the officers decided to reenter the Reif Center, and treat the women as if they were participants in the exercise. We cannot, on Summary Judgment, discredit the Plaintiffs' assertion, that the decision to reenter the building was an intentional violation of their rights, which would constitute an act of malice so as to foreclose a claim of official immunity. Accordingly, we deny the Motions of Cuffe, Hohman, Mettler, Peterson, and Scott, for Summary Judgment on the basis of qualified immunity.

■■ Once again, however, Akerson and Lehman present a different question. First, as to Lehman, the Plaintiffs assert that he knew that the Reif Center was not a part of the training exercise, and that, therefore, he had a ministerial duty to advise his officers of that fact. Moreover, they argue that, once Lehman became aware, during the initial stages of the training exercise, that individuals, including delivery persons and students reporting for weight lifting training, were not either aware or involved in the training exercise, see, *Lehman Report,* he had a ministerial duty to stop the exercise. We cannot agree.

While Lehman certainly realized that the Reif Center was not a part of the scenario, see, *Lehman Deposition,* at 11, we cannot conclude that he had a ministerial duty to advise his people of that fact. Rather, Lehman, and his officers, were

Peterson, had a duty to protect the Plaintiffs, and they failed in that duty. Consequently, we deny their Motion for Summary Judg-

involved in a training exercise which was supposed to simulate events in the most realistic of fashions. *Id.* at 20. Although the Plaintiffs make much of the fact that this was not a real life situation, but was, rather, a training exercise, we cannot so readily dismiss the seeming reality of the situation. See, e.g., *Watson v. Metropolitan Transit Commission,* supra at 415 ("[A]n emergency situation need not exist for official immunity to apply."). The incident was directly on the heels of the tragedy at Columbine High School, and the officers, with foreknowledge that a similar tragedy could arise in their own environs, needed to be prepared for that potential. The training in which they engaged was not only reasonable, but it was an unavoidable consequence of their public duty to prepare for the worst. As a result, in order instill reality into the exercise, so as require the participating officers to react to surprise, Lehman was required to parse the information provided to his officers. There is nothing in this Record to so much as suggest that Lehman was attempting to mislead his officers into believing that the Reif Center was a part of the exercise, and we find no error in his decision to spare the officers some details of the exercise that, as a matter of planning, were never thought would arise.

Further, as Lehman himself explained, he also knew only a limited amount about the scenario, in order to measure his ability to make decisions under exigency. As he testified at his deposition:

> Q. What did [Valley] tell you about the scenario? I want you to give me your best recollection of—you know, exact words isn't critical, but I'm looking for the extent of knowledge he gave you about what the scenario was to involve.

ment, which is based on the fact that they did not have direct contact with the Plaintiffs.

A. Very little. And that was intentional. We had discussed that at the walk-through on June 15th; that the scenario was designed to not only test individual team members in their response to this hostage situation but also the commanders, and so we weren't given a lot of details.

*Lehman Deposition*, at 54.

Lehman's role in this training program was to make judgment calls, which starkly contrasts with the type of absolute, conclusive responsibility that generally attends ministerial decisionmaking.

More importantly, the facts here reflect the following: Lehman did know that the Reif Center was not involved in the training exercise, see, *id*, at 11; he was involved in a walk-through of the Grand Rapids High School almost one month prior to the actual exercise, see, *id.* at 9; from his walk-through, he did not have a clear idea about the position of the Reif Center in relation to the school, see, *id.* at 9, 88; he had no idea that the Reif Center had a separate entrance, and offices, from the high school, see, *id.* at 12, 85–87; Lehman did not view any maps or schematics of the school prior to the training; see, *id.* at 93–94; Lehman believed, from discussions with Valley, that any areas which were not involved in the training exercise would be locked, see, *id.* at 81; and the officers were instructed that they were to conduct no forced entries, see, *id.* Given these facts, we cannot conclude that Lehman had an absolute, certain, and imperative duty, see, *Rico v. State,* supra at 107, to advise the team members that the Reif Center was off limits. Rather, his decision as to what information was to be shared with his officers was well within his exercise of broad discretion as the Commander of the St. Louis County ERT.

■ The second of Lehman's decisions, which the Plaintiffs pinpoint, is his election to allow the scenario to proceed, even though he had received a communication from Cuffe, during the scouting mission, which questioned whether construction workers, and students at the site, knew about the scenario, and even though he later learned, just after the exercise began, about individuals who did not know about the scenario. It is important to note, however, that the latter information did not come from the St. Louis County ERT members.

As to the communication from Cuffe, the Plaintiffs urge us to afford it more substance than it is due. During his scouting maneuver with Akerson, Cuffe noticed that there were construction workers, at or near the school, and he wanted to ensure that they knew about the training. See, *Cuffe Deposition,* at 20. Cuffe did not know if the construction workers were unaware of the exercise, and he never approached them. *Id.* at 20–21. Instead, he radioed Lehman, who said he would double check. *Id.* at 21. Sometime later, prior to the start of the exercise, Lehman confirmed, with Cuffe, that all of the individuals on the campus knew of the training. *Id.* There is no indication that Lehman did not actually double check this information, or that he lied to Cuffe, when he advised that all on the campus knew about the training. As a result, Cuffe's communication with Lehman has only remote relevance to our analysis.

More pertinent, however, is the alert that Lehman received, shortly into the training exercise, that individuals on the high school campus, including delivery persons and students, appeared to have no knowledge of the exercise. See, *Lehman Report.* The Plaintiffs contend that, once Lehman received that advisory, he had an absolute, immutable duty to halt the training exercise. We are not so persuaded.

We are obligated to evaluate Lehman's actions, not in a vacuum, but in the context

of the events in which he took those actions. As Lehman explained, the training scenario was not only devised to test his entry team, but also his reaction to the unexpected developments. *Lehman Deposition*, at 54. Although he was stationed at the Command Center, it was not his sole purpose to receive, and digest, radio communications. Rather, Officer Burns was monitoring the radio communications, which were coming from four or five different radios. *Id.* at 22. At some point, Lehman did become aware, that there were individuals on the campus, who were, at the least, not involved in the exercise and, at the most, were not aware of the exercise. See, *Lehman Report.* Lehman then had to decide his "next course of action", based on his knowledge of his team, as well as what he had been told by Valley; namely, that all of the individuals had been notified of the exercise, see, *Lehman Deposition*, at 35, and that there had been security posted at the entrances to the schools early that morning to advise people of the exercise, see, *id.* at 14. Moreover, as Lehman testified at his deposition, another factor in his decision was his belief that people would realize something was afoot due to the emergency vehicles in the parking lot of the school. *Id.* at 35–36.

Based upon the available information, Lehman had to make the decision whether to stop the exercise—which he hoped would be as realistic as possible, see, *id.* at 20, and which he regarded as essential training because of the then recent school shootings, see, *id.* at 8. On this Record, we cannot conclude that the available facts absolutely required him to stop the exercise, or to advise his team that someone on the campus might not know the exercise was in progress. Rather, the judgment he had to exercise was, quintessentially, a discretionary decision, for he had to select one of several appropriate courses of action within the context of the facts he

knew. See, *Tousignant v. St. Louis County*, 1998 WL 846581 at *1 (Minn.App. December 8, 1998)("In deciding whether an act is ministerial, the court must consider whether 'the nature, quality, and complexity of the decision making process' justifies granting official immunity.")[unpublished decision], quoting *Larson v. I.S.D. No. 314*, 289 N.W.2d 112, 120 (Minn.1979). While his ultimate decision may have not have been the absolute best choice, when viewed after-the-fact, and outside the pressures of that time, that is the type of decision that official immunity is designed to insulate from second-guessing. See, e.g., *Dokman v. County of Hennepin*, supra at 296 ("Only when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence.").

Finally, there is no indication, much less evidence, that either Lehman's decision not to specifically inform his team that the Reif Center was outside the exercise, or his decision to continue the exercise even after he learned that there were people on the premises who were unaware of the exercise, was done with malice or willfulness. As a consequence, we conclude that Lehman is entitled to official immunity for his actions and decisions, and therefore, we grant his Motion for Summary Judgment on the Plaintiffs' State law claims.

■ With respect to Akerson, the Plaintiffs have presented no specific facts upon which to challenge Akerson's claim of qualified immunity, which would tend to, in and of itself, commend our grant of his Motion. See, *Gerber v. Neveaux*, 578 N.W.2d 399, 403 (Minn.App.1998)("We hold that once a defendant asserts immunity, the plaintiff has the burden to articulate specifically the claim that must be scrutinized to determine the immunity issue and to make some showing of fact to

suggest the basis for the claim."). Nevertheless, viewing the entire Record objectively, we conclude that, based upon his role in the scenario, insofar as he interacted with the Plaintiffs, he is entitled to official immunity.

As we have already noted, it is uncontradicted that Akerson did not accompany the St. Louis County ERT entry team into the Reif Center, either during the initial incursion, or the subsequent entry which resulted in the confrontation with the Plaintiffs. Moreover, there is no evidence that Akerson was informed by the entry team, or overheard their conversation, as to the reason that they had initially retreated out the first door—the door to the Reif Center—and then later reentered. Further, once the Plaintiffs exited the Reif Center, no one-either his team members or the Plaintiffs—advised Akerson that the women were not involved in the scenario. Consequently, he engaged in his assigned duties, as a part of the scenario, by issuing commands to the Plaintiffs so as move them away from the building, and by directing them to proceed to Reserve Officer Heinrich.

We find nothing in Akerson's actions which could responsibly be considered ministerial. Rather, his function in the scenario was to provide inner perimeter security, and to stop, and detain, individuals exiting the school. It was completely within his discretion as to how he should execute his duties, as would be the case generally with police officers. Moreover, there is no contention, or evidence, that Akerson acted with malice in taking the actions he did. Therefore, we conclude that Akerson is entitled to official immunity, and grant his Motion for Summary Judgment on the Plaintiffs' State law claims.

■ 2. *Vicarious Official Immunity.* St. Louis County also claims an entitlement to vicarious official immunity.

"If a public official is entitled to immunity for a discretionary act, the employing entity is generally entitled to vicarious official immunity as well." *Fear v. ISD 911,* 634 N.W.2d 204, 216 (Minn.App.2001). As the Minnesota Supreme Court has explained:

When applicable, vicarious official immunity protects the government entity from suit based on the official immunity of its employee. In prior cases, "[g]enerally, if the employee is found to have immunity, the claim against the municipal employer has been dismissed without explanation." *Pletan* [*v. Gaines*], 494 N.W.2d 38, 42 [ (Minn.1992) ]. We apply vicarious official immunity when failure to grant it would focus "stifling attention" on the official's performance "to the serious detriment of that performance." *Olson v. Ramsey County,* 509 N.W.2d 368, 372 (Minn.1993). In such circumstances, we have concluded that "[i]t would be anomalous * * * to impose liability on the [government employer] for the very same acts for which [the employee] receives immunity." *Watson* [*v. Metropolitan Transit Commission* ], 553 N.W.2d at 415. We also suggested in dicta, however, that we might under some circumstances find an exception to vicarious official immunity and hold a governmental entity liable even though the official is not personally liable. *Pletan v. Gaines,* 494 N.W.2d 38, 42 (Minn.1992). * * * [W]e clarify that a grant of vicarious official immunity to a public employer would be based on the nature of an employee's immune conduct, whether or not the employee was actually named as a defendant in a lawsuit.

*Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 316 (Minn.1998).

■ "Whether to apply vicarious official immunity is a policy question" and, in considering police officer decisions, "[t]he

need to protect the public must be weighed against the concern that the public not be put at risk." *Kuha v. City of Minnetonka*, supra at 935; see also, *Sletten v. Ramsey County*, 2002 WL 109272 at *1 (Minn.App., January 29, 2002)(stating that the decision to apply vicarious immunity to a governmental entity is a policy question) [unpublished decision].

Since we conclude that Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, are not entitled to official immunity, then St. Louis County is not entitled to vicarious official immunity as to their actions. See, *Fear v. ISD 911*, supra at 215. However, we conclude that St. Louis County is entitled to vicarious immunity with respect to the actions of Akerson and Lehman. The Plaintiffs have advanced no countervailing policy considerations, which would militate against the granting of such an immunity, and we are unable to conceive of any. While the Reif Center, and Marty, argue that this case is different from those in which vicarious official immunity is normally granted, we believe the cases are analogous.

The Minnesota Supreme Court has applied vicarious official immunity to avoid "the focus of a stifling attention on the [employee's] performance, to the serious detriment of that performance," *Olson v. Ramsey County*, 509 N.W.2d 368, 372 (Minn.1993), and the Minnesota Court of Appeals has applied the immunity when it "serves to avoid chilling the [employee's] exercise of his independent judgment by allowing him to act without fearing that his conduct may eventually be subject to review by the judiciary and may expose his employer to civil liability," *Ireland v. Crow's Nest Yachts, Inc.*, 552 N.W.2d 269, 274 (Minn.App.1996). Here, although denying St. Louis County's request for vicarious official immunity would subject Akerson's, and Lehman's, acts to scrutiny, which may cause them to second-guess their actions in real life situations in the future, we believe that a more fundamental consideration is that they may decide not to engage in training, or would treat such training as something less than a real life situation. Given the climate of today's world, where unexpected violence greets the public with regularity, to chill the exercise, that is here in contest, out of existence, would ill serve the public's best interests. Accordingly, we believe that, under the facts presented here, such policy considerations support our grant of St. Louis County's Motion for Summary Judgment on vicarious official immunity grounds, but only with respect to Akerson's, and Lehman's actions, and we deny the paralleling Motions in regard to the actions of Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro.

 3. *Statutory Immunity*. St. Louis County also claims that it is entitled to statutory immunity for its decisions, and it actions, surrounding officer training. Pursuant to Minnesota Statutes Section 466.03, Subdivision 6, a government entity is immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused," and this type of immunity is known as statutory immunity. *Janklow v. Minnesota Bd. of Examiners*, supra at 715. "Statutory immunity was created when Minnesota waived its sovereign immunity to tort suits," in 1975, in order to provide some limited exceptions to the waiver. *Id.* at 714. Whether a government entity is protected by statutory immunity is a question of law. See, *Johnson v. State*, 553 N.W.2d 40, 45 (Minn. 1996); *Lishinski v. City of Duluth*, 634 N.W.2d 456, 458 (Minn.App.2001), rev. denied (Minn., January 15, 2002). The protection provided by statutory immunity is

to be narrowly construed. See, *Fear v. ISD 911,* supra at 210.

 Unlike official immunity, which protects decisions and actions at the operational level, see, *S.W. and J.W. v. Spring Lake Park Sch. Dist.,* 580 N.W.2d 19, 22 (Minn.1998), statutory immunity protects policy-making activities at the planning level. See, *Nusbaum v. County of Blue Earth,* 422 N.W.2d 713, 719 (Minn.1988); *Johnson v. State,* supra at 42; *Fear v. ISD 911,* supra at 210 ("While planning decisions involve questions of public policy and are protected as discretionary decisions, operational decisions relate to the day-to-day government operation and are not protected as discretionary decisions."). Further, while official immunity is available to an individual, and vicarious official immunity is accorded a governmental entity, statutory immunity applies only to the governmental entity. See, *Janklow v. Minnesota Bd. of Examiners,* supra at 716.

 In examining a claim of statutory immunity, the Court must "ascertain exactly what governmental conduct is being challenged." *Fear v. ISD 911,* supra at 210. Then we must examine whether the "government activity in question is planning or operational," as well as "whether the legislature intended to immunize the particular government activity that is the subject of the tort action." *Johnson v. State,* supra at 42.

While we recognize that several Courts have determined, in somewhat analogous circumstances, that a governmental entity's training decisions are policy-level, "planning" decisions, that are protected by statutory immunity, see, e.g., *Watson v. Metropolitan Transit Commission,* supra at 413; *Fear v. ISD 911,* supra at 212; *In re Alexandria Accident of February 8, 1994,* 561 N.W.2d 543, 548 (Minn.App. 1997); *Maras v. Brainerd,* 502 N.W.2d 69, 78 (Minn.App.1993), we conclude that St. Louis County's decision to have their employees train at the Grand Rapids High School on July 14, 1999, is not the decision that the Plaintiffs are contesting. Rather, the Plaintiffs are challenging the actions taken by Cuffe, Hohman, Mettler, Peterson, Scott and Zebro, when they decided to confront the Plaintiffs, even though they had reason to believe that the women were not involved in, or not advised of, the exercise.

As a result, the "planning" level decisions, which were made by St. Louis County in committing its ERT to the training, are not the decisions being disputed. Moreover, there can be no contention that the individual decisions, by the ERT members, were somehow policy infused, planning level decisions. Consequently, we conclude that St. Louis County is not entitled to statutory immunity, as to the claims related to the actions by Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, and we deny the County's Motion for Summary Judgment on that ground.

In sum, we conclude that the Plaintiffs' claim, under Section 1983, can proceed only against Cuffe, Hohman, Mettler, and Zebro. Further, their State law claims of negligent, and intentional, infliction of emotional distress, assault, battery, and false imprisonment, can proceed only against St. Louis County, Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro. Finally, St. Louis County cannot be held liable for any acts, or decisions, by Akerson or Lehman. In all other respects, we grant the Motions of St. Louis County, Akerson, Lehman, Peterson, and Scott, for Summary Judgment.

2. *The Motions of Grand Rapids for Summary Judgment.*

 The Plaintiffs have asserted Federal claims, under Section 1983, as well as State law claims of negligent and intentional infliction of emotional distress, as-

sault, battery, and false imprisonment, against the City of Grand Rapids. The Plaintiffs have not, however, sued any individual Grand Rapids officials. In turn, Grand Rapids has moved for Summary Judgment, and claims that the Plaintiffs have failed to allege an unconstitutional policy or custom, and therefore, that they cannot sustain a Section 1983 action against the City under *Monell v. Department of Social Servs.*, supra at 694, 98 S.Ct. 2018. The City also asserts that the State law causes of actions must be dismissed, because of the doctrines of vicarious official immunity, and statutory immunity, and also contends that the public duty doctrine precludes liability against it, and that no viable State tort claims exist.

The Plaintiffs have conceded that they have not alleged that an unconstitutional policy, or custom, by the City of Grand Rapids, caused them constitutional injury, and they also admit that no employee of Grand Rapids directly violated their constitutional rights. Therefore, the Plaintiffs cannot sustain their Section 1983 cause of action against Grand Rapids, and we grant its Motion for Summary Judgment on the Plaintiffs' Federal claims.

Moreover, the Plaintiffs Schafroth, and Wilson, have also conceded that their intentional tort claims—that is, for assault, battery, false imprisonment, and intentional infliction of emotional distress—are subject to a two-year statute of limitations. See, *Minnesota Statutes Section 541.07* ("[T]he following actions shall be com-

menced within two years: * * * for libel, slander, assault, battery, false imprisonment * * *."); *Hayes v. Blue Cross Blue Shield of Minnesota*, 21 F.Supp.2d 960, 977 (D.Minn.1998) ("Under Minnesota law, an action for an intentional tort must be commenced within two years after the accrual of the claim, or it is statutorily barred."). Since Grand Rapids was not joined in this case until late August, or early September, of 2001—two years and one and one-half months after the incident on July 14, 1999, these tort claims are not actionable. Accordingly, we grant Grand Rapids' Motion for Summary Judgment on Schafroth's, and Wilson's, claims of intentional infliction of emotional distress, assault, battery, and false imprisonment.

Lastly, even though Grand Rapids moved for Summary Judgment on Miskovich's claims of intentional infliction of emotional distress, assault, battery, and false imprisonment, see, *Defendant City of Grand Rapids' Memorandum of Law in Support of Motion for Summary Judgment*, at 21–24, Miskovich has wholly failed to address Grand Rapids' Motion as to the intentional infliction of emotional distress claim. More importantly, the Plaintiffs also admit that they "do not claim that any of the acts of Grand Rapids city employees were intentional," [14] *Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment*, at 19, and that "all of Plaintiffs' complaints against the City of Grand Rapids are grounded in negligence," see, *id.* at

---

14. Enigmatically, in the next sentence of their Memorandum, the Plaintiffs state that "[t]he evidence indicates that City of Grand Rapids Police Reserve Officer Heinrich pointed a gun at Plaintiffs * * * in spite of the fact that there was evidence that Plaintiffs were not involved in the training exercise," and that "Heinrich's actions were intentional as defined by Minnesota Law and as such are not subject to official immunity." *Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for*

*Summary Judgment*, at 19. Moreover, they also assert that Heinrich's actions constitute unreasonable force. *Id.* at 28. Nonetheless, the Plaintiffs later assert that "all of Plaintiffs' complaints against the City of Grand Rapids are grounded in negligence." *Id.* at 28 (referring to the statute of limitations problem for Schafroth, and Wilson, but also referring to their claims as they relate to all of the Plaintiffs in general).

28. Given these concessions, Miskovich has abandoned her intentional tort claims against the City of Grand Rapids and, therefore, we grant the City's Motion for Summary Judgment on those claims.

▇▇▇▇ Therefore, the only remaining claims against Grand Rapids are the claims of negligent infliction of emotional distress by Schafroth, Wilson, and Miskovich, as well as claims of joint venture or joint enterprise.[15] Since many of the defenses raised by Grand Rapids—including vicarious official, and statutory immunity—mirror those raise by St. Louis County, we will not set forth the contours of those pertinent doctrines. Rather, we incorporate our previous discussion of the law applicable to vicarious official, and statutory immunity, without reiterating those legal principles again.

a. *Vicarious Official Immunity.* The Plaintiffs have not named any of Grand Rapid's employees, who were involved in the training exercise on July 14, 1999, as Defendants in their respective actions. Nonetheless, vicarious official immunity is still available to the City. See, *Wiederholt v. City of Minneapolis,* supra at 316 ("[W]e clarify that a grant of vicarious

official immunity to a public employer would be based on the nature of an employee's immune conduct, whether or not the employee was actually named as a defendant in a lawsuit."). "To deny a government employer vicarious official immunity simply because the official was not named in the suit would allow plaintiffs to defeat immunity by declining to name the official as a defendant." *Id.* at 317.

▇▇▇▇ To determine whether Grand Rapids is entitled to vicarious official immunity, which is ultimately a policy decision, see, *Kuha v. City of Minnetonka,* supra at 935, we must look at the actions of the Grand Rapids officials who, the Plaintiffs allege, were negligent. See, *Wiederholt v. City of Minneapolis,* supra at 316; *Gerber v. Neveaux,* supra at 403 ("We hold that once a defendant asserts immunity, the plaintiff has the burden to articulate specifically the claim that must be scrutinized to determine the immunity issue and to make some showing of fact to suggest the basis for the claim."). In this instance, the Plaintiffs have isolated the following acts of the employees of Grand Rapids: the failure of the Reserve Officers

---

**15.** The Plaintiffs assert that Grand Rapids was in a joint enterprise, or a joint venture with St. Louis County, when the St. Louis County ERT encountered the Plaintiffs, and therefore, that St. Louis County's negligence should be imputed to Grand Rapids on a theory of shared liability. "Courts apply the joint venture or joint enterprise doctrine 'when necessary to impute negligence between two entities that otherwise have no legal relationship.'" *Beehner v. Cragun Corp.,* 636 N.W.2d 821, 832 (Minn.App.2001), quoting *Stelling v. Hanson Silo Co.,* 563 N.W.2d 286, 290 (Minn.App.1997). Joint enterprise is established by showing: 1) a mutual undertaking for a common purpose; and 2) a right to a voice in the direction and control of the means to carry out that purpose. See, *Mellett v. Fairview Health Servs.,* 634 N.W.2d 421, 424 (Minn.2001). In turn, a joint venture requires the following: 1) contribution of re-

sources; 2) joint proprietorship and control over the subject matter of the property engaged in the joint venture; 3) sharing of profits by express or implied agreement; and 4) an express or implied contract showing the joint venture. *Beehner v. Cragun Corp.,* supra at 832.

Grand Rapids did not argue Summary Judgment, as to the joint venture contentions, in its initial brief. Rather, once the Plaintiffs noted that they still maintained their claim of joint venture, Grand Rapids argued, in its Reply Memorandum, that there was no joint venture in this case. See, *City of Grand Rapids' Reply Memorandum of Law in Support of the Motion for Summary Judgment,* at 10–11. We will not address that argument, however, as the Plaintiffs were not afforded an opportunity to respond, and because Grand Rapids has never moved for Summary Judgment on an asserted claim of joint enterprise.

to be at their posts by 6:45 o'clock a.m., which was the time Valley claimed he set them to be there, see, *Valley Deposition*, at 31, *Helmer Deposition*, at 10 (in position by probably 8:15 o'clock a.m.), *Bylkas Deposition*, at 8–12 (in position between 8:45 and 9:00 o'clock a.m.), *Kotula Deposition*, at 13 (in position by about 8:45 o'clock a.m.); the action by Heinrich in pointing her gun at, as well as in detaining, the Plaintiffs when directed to do so by Akerson, see, *Heinrich Deposition*, at 26–27; the fact that Valley informed the media about the training, but did not ensure that they broadcasted any information about the exercise, see, *Valley Deposition*, at 21–23; the fact that the maps that Valley provided to the teams only depicted the first floor of the high school, and the maps did not portray the Reif Center, see, *id.* at 51–53; the fact that Valley did not specifically inform the officers that the Reif Center was off limits, and describe the position of the Reif Center, see, *Mettler Deposition*, at 12, *Zebro Deposition*, at 14, *Scott Deposition*, at 41, *Akerson Deposition*, at 45, *Cuffe Deposition*, at 17; and the fact that, although Valley believed that the doors which were not supposed to be entered in the training exercise would be locked, see, *Valley Deposition*, at 55, 77, and he had advised the teams as such, see, *id.*, at 54–55, *Lehman Deposition*, at 81, *Mettler Deposition*, at 10, *Zebro Deposition*, at 10, *Cuffe Deposition*, at 17, he did not double-check to ensure that the doors were indeed locked, see, *Valley Deposition*, at 55.

In analyzing the applicability of official immunity to these individualized acts, and vicarious official immunity, as claimed by Grand Rapids, we first turn to the decisions, and actions, of Valley. Under the circumstances, we find Valley's acts and decisions to be distinctly discretionary. Valley was charged with planning the training for police officers, in the wake of the then recent tragedy at Columbine High School. He had to decide how to commit his available resources, who to invite to the training exercise, what scenarios should be employed, what facilities should be used, and how to best insure the safety of all concerned, including the public. See, *Tousignant v. St. Louis County*, supra at 1998 WL 846581, *1 ("In deciding whether an act is ministerial, the court must consider whether 'the nature, quality, and complexity of the decision making process' justifies granting official immunity."), quoting *Larson v. I.S.D. No. 314*, supra at 120.

In completing these tasks, necessarily, Valley had to delegate certain of his duties. Therefore, the fact that he asked the newspaper, and the radio and television stations, to broadcast messages about the training, does not translate into an absolute, immutable duty to check on the status of those broadcasts, especially in view of all of the other tasks he had to accomplish so as to effectuate an effective, and safe, training program. Thus, we conclude that his decision, to not double-check the status of the public media announcements, was truly a discretionary decision.

 The same is true for the status of the doors, as Valley thought the school's janitors would lock the doors to those areas of the campus which were off limits, and he advised the teams to that effect. It was understandable, given the hectic morning of the training exercise, that he did not double check to ensure that the doors were locked, and we find no absolute, certain duty, on his part, to do so. Therefore, we find nothing to erode Valley's entitlement of official immunity to this decision.

 Moreover, paralleling our discussion related to Lehman, we cannot say that Valley's decision, concerning the information he provided to the teams regarding the Reif Center, as well as the fact that

the maps he distributed included only one floor, amounted to ministerial decisions. As we have stated, the training scenario was to be as realistic as possible. Therefore, Valley only informed the teams of the information he thought was necessary in order to allow them to complete the training. His decision not to specifically tell the officers about the Reif Center is understandable, given his belief that all of the doors to the areas, which were not to be included in the exercise, would be locked, and that all of the individuals on campus had been notified of the training, either through Adams, or by the barricades set up at the entrances to the campus. Moreover, he could properly assume, as a proper exercise of discretion, that the maps, which did not include the Reif Center, would alert the teams that the Reif Center—although not specifically identified by name—was not part of the scenario.

██ Further, while the maps distributed by Valley only included the first floor of the high school, we do not believe that his decision, to only distribute that map, amounts to a ministerial act. First, most of the training program was only to occur on the first floor of the school, so there was no need for a map of the second or third floors.[16] Moreover, the fact that the third scenario was to occur on the third floor was intentionally concealed by Valley, so to insure a realistic feel to the training, is plainly a discretionary act. Finally, Valley's decisions were predicated on his understanding that only the areas in play would be unlocked, and all other areas would be inaccessible. Consequently, even though, after-the-fact, some might characterize Valley's decisions as being wrong, or even negligent, because they emanated from his exercise of discretion, they are protected by official immunity.[17]

Even though Valley is protected by official immunity, we are obligated to determine, nonetheless, whether Grand Rapids is entitled to vicarious official immunity for Valley's alleged negligence. For reasons we have previously detailed, we conclude that weighty policy considerations support a grant of Grand Rapid's invocation of vicarious official immunity, and we grant Grand Rapid's Motion for Summary Judgment on those grounds.

██ The acts of the Reserve Officers were not discretionary, for they were to stand guard, at the barricades, as directed by Valley, at 6:45 o'clock a.m. They did not man their posts, however, until well after that time. While disagreements abound in this Record as to when the Reserve Officers were at their assigned posts, there can be no doubt that their responsibility, in informing visitors about the training exercise, were absolute and certain—they were purely ministerial. Therefore, not arriving at the barricades at the time that they were directed to do so, and allowing persons to pass through the barricades without telling them about the training—thereby allowing the Plaintiffs into the school without verbal notification of the training—are not acts protected by qualified immunity. Consequently, Grand Rapids is not protected by vicarious official immunity as to those acts. See, *Fear v. I.S.D. No. 911*, supra at 215.

---

16. By every appearance in this Record, the Reif Center is considered to be the second floor of the school, and it does not appear that Valley, or anyone else, purposely removed the Reif Center from the map of the first floor. See, *Exs. R, S and T to Aff. of Jason J. Kuboushek* (maps of the first, second, and third floors of the high school, which show the Reif Center on the second floor).

17. There is neither a contention, nor a showing, that Valley's decisions were prompted by malice or willfulness, so as to strip him of official immunity.

 The same is true for Heinrich. She testified that she raised her gun at the Plaintiffs, because she was ordered to do so by Akerson. See, *Heinrich Deposition*, at 26. According to Heinrich, given that order, she had only one course of action— to comply. *Id.* at 34. Moreover, Heinrich testified that she began to think the women might not have been aware of the training exercise, and consequently, she informed them that it was only a training program, and that they would be all right. *Id.* at 28–29. Further, according to Heinrich, the Plaintiffs told her that they were not aware of the training. *Id.* at 29, 58. Nonetheless, according to the Plaintiffs, Heinrich continued to detain them, and to treat them as if they were a part of the training scenario.[18] See, *Miskovich Deposition*, at 41–44; *Schafroth Deposition*, at 57–58; *Wilson Deposition*, at 44. Given these facts, which we are obligated to assume as true, and which were allegedly known by Heinrich, we find that she had an absolute course of action with respect to the Plaintiffs—she should have double checked the status of the Plaintiffs, and then release them, or at least, ensure that they were released without being further treated as participants in the scenario. Since we conclude that Heinrich is not entitled to official immunity for these ministerial decisions, we deny Grand Rapid's request for vicarious official immunity as to her actions.[19]

As a result, we grant, in part, Grand Rapid's Motion for Summary Judgment on the basis of vicious official immunity, insofar as it relates to the allegedly negligent acts of Valley, but we deny the Motion to the extent that we have found that the actions of the Reserve Officers, and Heinrich, were ministerial, and not entitled to official immunity.

b. *Statutory Immunity.* As we have observed, this type of immunity applies to policy-making activities at the planning level. See, *Nusbaum v. Blue Earth County*, supra at 719. Moreover, as had been true with St. Louis County, Grand Rapids attempts to argue, that statutory immunity protects them from their employees' negligence, because it made a conscious decision, based on various policy considerations, to conduct, and participate in, the training session which lead to the Plaintiffs' Complaints. Just as St. Louis County had misconstrued the Plaintiffs' allegations, so has Grand Rapids.

The Plaintiffs concede that "[t]he plan for this training exercise promulgated by the City of Grand Rapids Police Officer Ste[phen] Valley was actually quite good." *Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment*, at 15. Moreover, there does not appear to be any claim, against the City, for allowing their officers to participate in the training, as such a claim

---

**18.** Heinrich's testimony on this point is different, as she contends that, once she was told, by Akerson, that the Plaintiffs could be released, she released them. See, *Heinrich Deposition*, at 30. Nonetheless, we take the facts in the light most favorable to the nonmoving parties here, which are the Plaintiffs.

**19.** Although it may seem, at first blush, that our conclusion that Heinrich's actions were ministerial conflicts with our previous finding that Akerson's actions were discretionary, but we find no such inconsistency. In contrast to Heinrich, who testified that she was told by Akerson to keep her weapon on the women, and therefore, did so, *Heinrich Deposition*, at 26, Akerson's role in the scenario was to decide how to handle various individuals who exited the building, *Akerson Deposition*, at 16. It was, therefore, within his judgment and discretion as to how to handle the Plaintiffs. Moreover, after Heinrich had stayed with the Plaintiffs for a short while, she began to question their knowledge of the training scenario, *Heinrich Deposition*, at 28–29, and therefore, she had more information about the Plaintiffs' status than was, on this Record, available to Akerson.

would undoubtably fail. Cf., *Watson v. Metropolitan Transit Commission*, supra at 413; *Fear v. I.S.D. No. 911*, supra at 212; *Maras v. Brainerd*, supra at 78. Rather, the Plaintiffs target their arguments against the individual actions of the employees of Grand Rapids.

█ We have already concluded the Valley's actions are entitled to official immunity, so we need not determine whether Grand Rapids is entitled to statutory immunity for those decisions.[20] Thus, the only contentions, which remain, are those against Heinrich, and the other Reserve Officers, who were manning the barricades to the entrances of the school. We are unable to accept, however, any argument, by Grand Rapids, that the decisions at issue—namely, when to arrive at the school, whether to point a gun at the Plaintiffs, and whether to treat them as participants of the scenario—should constitute policy infused, planning level decisions. Rather, their decisions, while not only ministerial, fall squarely in the operational decisions that statutory immunity does not protect. See, *S.W. and J.W. v. Spring Lake Park Sch. Dist.*, supra at 22. Therefore, Grand Rapids is not immune from liability for those decisions of its employees, and we deny Grand Rapids' Motion for Summary Judgment on the basis of statutory immunity.

█ c. *The Public Duty Doctrine.* Grand Rapids also claims that it is entitled to Summary Judgment, on the Plaintiffs' tort claims, because the Plaintiffs have failed to show that the City owed them a "special duty," which is required by the "public duty doctrine." The "public duty doctrine" instructs, that "general duties owed to the entire public rather than a specific class of persons cannot form the basis of a negligence action." *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 804 (Minn.1979). In *Cracraft*, the Court held that a City Inspector's alleged failure to conduct a fire inspection with due care could not be the basis of a negligence action, as the ordinances which require such inspections, "are designed to protect the municipality's own interests, rather than the interests of a particular class of individuals," such as the premises inspected, or the rights of third persons. *Id.* at 805. Thus, "only a 'public' duty to inspect" was created, and such a duty could not be the basis of a negligence action, because "[i]t is a basic principle of negligence law that public duties created by statute cannot be the basis of a negligence action even against private tortfeasors." *Id.* Consequently, "a municipality cannot be

---

**20.** The Plaintiffs contend that, "even if the Court finds that the officers had official immunity and that the City of Grand Rapids has vicarious official immunity, it does not mean that the City is dismissed," as "the 'discretion' applicable to statutory immunity is different, and more narrow, than that of official immunity." *Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment*, at 19–20. We disagree. First, the Plaintiffs do not appear to contend that Grand Rapids' decision, to actually hold the training, or to commit their forces to the training, was a negligent decision, which would not be entitled to statutory immunity. Moreover, we have already determined that Valley's actions are protected by official immunity, which has a broader definition of "discretion." See, *Rico v. State*, supra at 107. If any of the actions, by Valley, are claimed to be at the policy-making, planning level, the Plaintiffs have not alerted us to any of those decisions which are within that category, and they have rather pointedly opposed such a categorization. See, *Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment*, at 16–18. While we certainly recognize that official immunity, and statutory immunity, apply to two different category of actions, see, *S.W. and J.W. v. Spring Lake Park Sch. Dist.*, supra at 22, we are aware of no allegations against Grand Rapids, and Valley in particular, which fall outside of both of the those types of immunity.

held liable for failing to supply general police or fire protection." *Dahlheimer v. City of Dayton,* 441 N.W.2d 534, 537 (Minn.App.1989).

Nonetheless, even if a municipality's action should fall under the "public duty doctrine," a negligence action would not be completely foreclosed. Rather, as the Court in *Cracraft* explained:

> [A] municipality does not owe any individual a duty of care merely by the fact that it enacts a general ordinance requiring fire code inspections or by the fact that it undertakes an inspection for fire code violations. A duty of care arises only when there are additional indicia that the municipality has undertaken the responsibility of not only protecting itself, but also undertaken the responsibility of protecting a particular class of persons from the risks associated with fire code violations.

*Cracraft v. City of St. Louis Park,* supra at 806.

Thus, a "special" duty arises when:

(1) the municipality had actual knowledge of a dangerous condition;

(2) the injured party reasonably relied on representations and conduct of the municipality or its agents so as to forego other ways of protecting himself;

(3) the duty of care was created by an ordinance or statute setting forth mandatory acts for protections of a particular class; and

(4) the municipality did not exercise due care to avoid increasing the risk of harm.

*Dahlheimer v. City of Dayton,* supra at 538; see also, *Hage v. Stade,* 304 N.W.2d 283, 285 (Minn.1981); *Cracraft v. City of St. Louis Park,* supra at 806–07; *Blatz v. Allina Health Sys.,* 1998 WL 901744 at *3 (Minn.App., December 29, 1998)[unpublished decision]. "Not all four factors must be met for a special duty to exist." *Blatz*

*v. Allina Health Sys.,* supra at 1998 WL 901744, *3, citing *Andrade v. Ellefson,* 391 N.W.2d 836, 841 (Minn.1986).

Grand Rapids argues that the public duty doctrine applies here, because the "plaintiffs appear to assert the police should have done more to prevent them from being involved in the training exercise." *Defendant City of Grand Rapids' Memorandum of Law in Support of Motion for Summary Judgment,* at 19. They further argue that the Plaintiffs have not shown that the City owed them a special duty. We cannot agree with the premise, that the public duty doctrine should apply here and, therefore, we do not reach the question of whether the Plaintiffs have shown that Grand Rapids assumed a special duty.

As the Plaintiffs have acknowledged, they do not seek to hold Grand Rapids liable for a failure to provide general police protection, by alleging that the City had a duty to do more to prevent them from being involved in the training exercise— rather, they seek to hold Grand Rapids liable for its own negligence in the execution of the training that it voluntarily undertook. Thus, we are presented with a circumstance in which the Plaintiffs are alleging "a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed to the general public." *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158, 160 (1972).

The Plaintiffs' allegations, here, are not similar to those in *Blatz,* where the County defendant undertook to train its peace officers to be first responders, in emergency situations, and the plaintiff complained that the County, as a result, had a legal duty to inspect and maintain oxygen kits in its patrol cars. *Blatz v. Allina Health Sys.,* supra at 1998 WL 901744, *2. In that situation, the Court, in *Blatz,* decided that

the public duty doctrine did apply, because "training deputies to be first responders able to use oxygen kits is just one more aspect of providing general police protection to the public." *Id.* The Court then determined whether the plaintiff had adequately alleged, that the County had undertaken a special duty. *Id.* at 1998 WL 901744, *2. Here, in contrast, the County did elect to provide training to its officers, but it is not that decision, or the officer's subsequent use of the knowledge gained during that training, that is at issue. Rather, it is the officer's actions, in conducting the actual training, that are at issue here, and we are unable to conclude that such allegations are properly within the public duty doctrine. Therefore, we need not decide whether the Plaintiffs have shown that Grand Rapids owed them a special duty, in order to overcome the public duty doctrine, and we deny Grand Rapid's Motion for Summary Judgment on this issue.

■■ d. *The Failure to Allege Sufficient Facts for Negligent Infliction of Emotional Distress.* Lastly, Grand Rapids urges that the Plaintiffs have failed to allege, or adduce facts sufficient to support a claimed negligent infliction of emotional distress. The argument is wholly without merit.

As we have previously explained, in order to maintain a claimed negligent infliction of emotional distress, a plaintiff must prove:

1) [she] suffered from a physical injury;

2) [she] was within the zone of danger of physical impact, that [she] reasonably feared for [her] own safety, and that [she] suffered severe emotion distress as a result; or

3) 'there has been a "direct invasion of her rights such as that constituting slander, libel, malicious prosecution, seduction or other willful, wanton or malicious conduct.'"

*Hern v. Bankers Life Casualty Co.*, 133 F.Supp.2d 1130, 1135 (D.Minn.2001), quoting *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996), quoting in turn, *State Farm Mut. Auto. Ins. Co. v. Village of Isle*, 265 Minn. 360, 122 N.W.2d 36, 41 (1963).

■■■ In the first category, a plaintiff can recover for mental anguish which accompanies a physical injury that resulted from a negligent act, see, *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, supra at 560, and, "[i]n the last category, negligent infliction of emotional distress is an element of the damages arising from an intentional tort that constitutes a direct violation of the Plaintiff's rights." *Hern v. Bankers Life Casualty Co.*, supra at 1135, citing *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, supra at 560.

Here, the Plaintiffs rely mainly on the second category, which requires the following showing:

(1) [the plaintiff] was within a zone of danger of physical impact;

(2) [she] reasonably feared for her own safety; and

(3) [she] suffered severe emotional distress with attendant physical manifestations.

*Stead–Bowers v. Langley*, 636 N.W.2d 334, 342 (Minn.App.2001), rev. denied (Minn. February 19, 2002).

Grand Rapids contends that the Plaintiffs have not shown any physical manifestation of their alleged emotional distress.

Quite to the contrary, however, the Plaintiffs have alleged sufficient physical manifestations of their emotional distress. See, e.g., *Quill v. Trans World Airlines*, 361 N.W.2d 438, 440, 443 (Minn.App.1985)(finding that allegations of the physical manifestations of "adrenaline surges, sweaty hands, elevated pulse and blood pressure," were sufficient to estab-

lish a *prima facie* case of negligent infliction of emotional distress). For example, Miskovich has complained of panic attacks, attended by excessive perspiration, shortness of breath, loss of concentration, and nervousness. See, *Miskovich Deposition*, at 105, 110. Schafroth asserts that she continues to suffer from general overall anxiety, and that she has been prescribed medication for that anxiety. See, *Schafroth Deposition*, at 70. Finally, similar to Miskovich, Wilson suffers from panic attacks, which are evidenced by heart palpitations, shortness of breath, fear, and occasional insomnia, as related to nightmares involving men in camouflage with rifles. See, *Wilson Deposition*, at 95, 100–01, 103–04. We conclude that, on this Record, the Plaintiffs have shown sufficient physical manifestations of their alleged emotional distress so as to survive Grand Rapids' Motion for Summary Judgment.

### 3. *The Motions of the Reif Center and Marty for Summary Judgment.*

Finally, the Reif Center, and Marty, also move for Summary Judgment. Both were sued directly by Miskovich, and her husband, but, since the Reif Center, and Marty, are Schafroth's and Wilson's employer, or an officer of their employer, they are named in those actions as Third–Party Defendants, since St. Louis County, and the St. Louis County ERT team members, have sued them for contribution.

The Reif Center, and Marty, assert that they are entitled to Summary Judgment for the following reasons: they did not have a duty to warn the Plaintiffs about the training exercise that was to occur at the high school; the Plaintiffs have not established a claim for intentional or negligent infliction of emotional distress; the St. Louis County Defendants' claim for contribution fails, because it is reliant on a finding of fault which cannot be proved; and, to the extent the Miskovich is asserting a joint enterprise claim, the Reif Center, and Marty, were not involved in a joint venture with the other defendants. In turn, Miskovich, Schafroth, and Wilson, have narrowed the contentions between the parties, and have conceded that they do not advance a claim of intentional infliction of emotional distress against the Reif Center, and Marty, nor do they contend that the Reif Center, and Marty, were involved in a joint enterprise, or venture, with the other Defendants.[21] Therefore, the only remaining claims, against these Defendants, appear to be the claims for the negligent infliction of emotional distress.

The Plaintiffs maintain that the Reif Center, and Marty, had a duty to warn Schafroth, Miskovich, and Wilson, about the training. There remains a genuine question of material fact as to what notice the Reif Center, and Marty, had about the training exercise because, although Marty has asserted, that he was not informed that there was going to be a training exercise on July 14, 1999, there is evidence that Adams notified Marty directly, see, *Adams Deposition*, at 42–43; that Adams called Lien about the exercise, and gave her the

---

**21.** In their responsive Memorandum, the Plaintiffs only state that they do not allege that the Reif Center, or Marty, were involved in a joint venture with the other Defendants, but they mention nothing about a joint enterprise. *Plaintiffs' Memorandum in Response to David Marty and Myles Reif Performing Arts Center Motion for Summary Judgment*, at 23. However, as the Reif Center, and Marty, have moved for Summary Judgment on both the joint enterprise, and the joint venture claims, see, *Defendant Myles Reif Performing Arts Center's and Defendant David Marty' s Memorandum of Law in Support of Their Motion for Summary Judgment*, at 16–18, and the Plaintiffs failed to mention, or to proffer any evidence supporting, the joint enterprise claim, we conclude that they have abandoned any such claim.

date of the exercise, see, *id.* at 46; *Lien Deposition*, at 31; and that Lien relayed that message to Marty, see, *Lien Deposition*, at 32. There is no dispute, however, concerning the fact that the Plaintiffs had no notice of the exercise. Further, there is no dispute that the Reif Center was not to be used as part of the training exercise, see, *Valley Deposition*, at 11, *Adams Deposition*, at 10; and Adams claims that he informed Marty as such, see, *Adams Deposition*, at 43.

 The core of the issue presented, however, is whether the Reif Center, and Marty, owed a duty to warn Schafroth, Wilson, and Miskovich, about the existence of the training exercise. To maintain a claim for negligence, a plaintiff must show: 1) a duty; 2) a breach of that duty; 3) a causal connection between the breach of duty and the injury; and 4) injury. See, *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn.1982); *Schmanski v. Church of St. Casimir of Wells*, 243 Minn. 289, 67 N.W.2d 644, 646 (1954); *Boitz v. Preblich*, 405 N.W.2d 907, 912 (Minn.App. 1987).[22] The Reif Center, and Marty, claim that they had no duty to warn here—a question that is normally of law for the Court. See, *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985); *Hellman v.*

*Julius Kolesar, Inc.*, 399 N.W.2d 654, 656 (Minn.App.1987).

 Where a risk of harm is sufficiently foreseeable, a duty to warn may be imposed. See, *Larson v. Larson*, supra at 289; see also, *Austin v. Metropolitan Life Ins. Co.*, 277 Minn. 214, 152 N.W.2d 136, 138 (1967)("The common-law test of duty is the probability or foreseeability of injury to plaintiff."). However, the risk of harm must be reasonably anticipatable, and may not be based on what actually happened. See, *Austin v. Metropolitan Life Ins. Co.*, supra at 138; see also, *Boitz v. Preblich*, supra at 912 (concluding that an incident, in which a dog that the owners knew was friendly, active, and liked to run, bumped into a neighbor and caused him to fall, was not negligence as a matter of law because the accident was not foreseeable); *Hellman v. Julius Kolesar, Inc.*, supra at 656 (determining that, although the accident at issue involved a utility pole that was at the side of a well traveled rode, and the plaintiff alleged that the utility company negligently situated the pole, thereby resulting in injury to the plaintiff when he struck the pole as a result of a collision with another vehicle, the collision with the pole was not a reasonably foreseeable act).

**22.** The relationship between the Plaintiffs, and the Reif Center and Marty differ, as Miskovich was an independent contractor, which implicates an analysis of the duty that a landowner owes a business invitee, while Schafroth, and Wilson, were employees. Nonetheless, the duties owed by the Reif Center, and Marty, to these differently situated persons is essentially the same. Compare, *Sutherland v. Barton*, 570 N.W.2d 1, 7 (Minn.1997)(stating that "[l]andowners have a duty 'to use reasonable care for the safety of all such persons invited upon the premises'" in a case involving employees of an independent contractor), quoting *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639, 647 (1972), with *Stenvik v. Constant*, 502 N.W.2d 416, 421 (Minn.App.1993)(concluding that, where the

Trial Court gave a Jury instruction regarding, in part, a landowner's duty to an entrant—to wit, "a duty to use reasonable care to inspect and repair his premises and warn an entrant who comes upon his premises to protect the entrant from an unreasonable risk of harm caused by the condition of the premises while he is on the premises," there was no harm even if the plaintiff was an employee, rather than an independent contractor, or an "entrant," as "the requested instruction on the duty of an employer is not significantly different from the instructions that were given"). The common theme in both cases, however, is that the harm must be foreseeable. See, *Sutherland v. Barton*, supra at 6; *Stenvik v. Constant*, supra at 421.

"The duty to exercise care is dictated and measured by the exigencies of the occasion as they are or should be known, and if no harm should be anticipated as a consequence of the act, there can be no negligence." *Austin v. Metropolitan Life Ins. Co.*, supra at 138. As the Minnesota Supreme Court has more recently explained:

> Breach of duty such as to constitute negligence in the keeping of the premises reasonably safe is not proved by the mere occurrence of an accident. Negligence must be predicated on what should have been reasonably anticipated, not merely on what happened * * *. The duty is to guard, not against all possible consequences, but only against those which are reasonably to be anticipated in the normal course of events.

*Bisher v. Homart Devel. Co.*, 328 N.W.2d 731, 733 (Minn.1983), quoting *Johnson v. Evanski*, 221 Minn. 323, 22 N.W.2d 213, 215 (1946).

Therefore, unless it was reasonably foreseeable that Miskovich, Schafroth, and Wilson, would be harmed by the training exercise, while working in the Reif Center, the Reif Center, and Marty, had no duty towards these Plaintiffs, and they cannot be found to have been negligent in carrying out that duty. We conclude, given the Record as a whole, that the circumstances were not reasonably foreseeable.

This case is closely analogous to *Boitz v. Preblich*, supra, where the plaintiff approached the defendant's home in order to alert the defendant that the lights on his car were engaged. *Id.* at 909. After the plaintiff advised the defendant about the situation, an individual opened the door of the house to proceed outside to shut the car lights off, and the defendant's dog ran out the door. The dog was a thirty-pound springer spaniel, who the defendant knew was friendly and active. *Id.* The dog bumped into the back of the plaintiff's legs, while the plaintiff was walking away from the defendant's home, and caused him to trip. The plaintiff was injured, and he sued the defendant—the owner of the dog—for, among other claimed wrongs, negligence. *Id.* The Court determined, however, that the resulting accident was not reasonably foreseeable, and that the defendant was, consequently, not negligent as a matter of law. *Id.* at 912. While the defendant admitted, that he normally kept his dog chained up while in the yard, in order to avoid him running loose, "[t]here [was] no indication that [the defendant] had any reason to anticipate that personal injury would result to [the plaintiff], or anyone else, if [the dog] left the house." *Id.* The Court noted that the plaintiff's injuries, "although unfortunate, were not the probable or foreseeable consequence of respondents' action or inaction." *Id.*

The same is true here. Even assuming, that the Reif Center, and Marty, had notice of the exercise, it is uncontroverted that all parties believed that the Reif Center was not involved in the exercise. Thus, while we could conceive of situations, which could impose a duty upon these Defendants to warn the Plaintiffs about the training exercise—such as, the prospect that the Reif Center, and Marty, could have foreseen that Schafroth, Miskovich, and Wilson, would observe the activities outside their windows and become scared—that is not what happened here. Rather, the Plaintiffs complain that they were confronted, in their offices, by members of the St. Louis County ERT, and were treated as participants in the exercise and, thereby, had to submit to seizure, and detention, by the officers.

In our considered view, the foreseeability issue pivots on the uncontemplated development, that the officers would enter the Reif Center, through a door that should not have been open to them, and

subject its inhabitants to the rigors of the training. Those actions were not reasonably foreseeable in view of all the precautions to exclude the Reif Center from the exercise. As a consequence, the specific harm that befell the Plaintiffs was not reasonably foreseeable to the Reif Center, or to Marty. Therefore, we grant their Motion for Summary Judgment against both Miskovich, and the St. Louis County Defendants.[23]

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiffs' Motions to Amend the Complaint [Docket Nos. 62 (Civ. No. 00–1944) and 36 (Civ. No. 01–824) ] are GRANTED.

2. That the Motions of Defendant St. Louis County for Summary Judgment on the Section 1983 Claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are GRANTED.

3. That the Motions of Defendants Akerson, Lehman, Peterson, and Scott, for Summary Judgment on the Section 1983 Claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are GRANTED.

4. That the Motions of Defendants Cuffe, Hohman, Mettler, and Zebro, for Summary Judgment on the Section 1983 Claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are DENIED.

5. That the Motions of Defendants Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, for Summary Judgment on the Plaintiffs' State Law claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are DENIED.

6. That the Motions of Defendants Akerson, and Lehman, for Summary Judgment on the Plaintiffs' State Law claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are GRANTED.

7. That the Motions of Defendant St. Louis County for Summary Judgment on the Plaintiffs' State Law claims [Docket Nos. 52 (Civ. No. 00–1944) and 26 (Civ. No. 01–824) ] are GRANTED, in part, and DENIED, in part.

8. That the Motions of Defendant Grand Rapids for Summary Judgment on the Section 1983 claims [Docket Nos. 48 (Civ. No. 00–1944) and 19 (Civ. No. 01–824) ] are GRANTED.

9. That the Motions of Defendant Grand Rapids for Summary Judgment on the State Law claims [Docket Nos. 48 (Civ. No. 00–1944) and 19 (Civ. No. 01–824)] are GRANTED, in part, and DENIED, in part.

10. That the Motions of Defendants Reif Center and Marty for Summary Judgment on all claims brought by Miskovich, and the claim for contribution by the St. Louis County Defendants [Docket Nos.

23. We do not separately analyze the St. Louis County Defendants' claim for contribution against the Reif Center, and Marty, because the common law of contribution "does not justify * * * contribution from parties who are not liable to the injured party," as "[t]he essence of the action of contribution is common liability." *Engvall v. Soo Line R.R. Co.,* 632 N.W.2d 560, 568 (Minn.2001), quoting *Horton v. Orbeth, Inc.,* 342 N.W.2d 112, 114 (Minn.1984). "Joint *liability,* rather than joint or concurring *negligence,* determines the right of contribution." *Id.,* quoting *Horton v.*

*Orbeth, Inc.,* supra [emphasis in original]. Since we conclude that the Reif Center, and Marty, cannot be liable to the Plaintiffs, as the harm to the Plaintiffs was not foreseeable, the Third Party claim for contribution must fail.

Further we have not separately addressed the Defendants' assertion, that the Plaintiffs have failed to establish a claim for negligent infliction of emotional distress, as we have concluded, for reasons discussed in the text, that the Defendants cannot be held liable for any negligence.

45 (Civ. No. 00–1944) and 23 (Civ. No. 01–824) ], are GRANTED.